# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## CASE NO 06CV2195 (TFH)
_____

## GUNDERSEN LUTHERAN MEDICAL CENTER, INC.

**Plaintiff**

v.

## MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES

**Defendant**
_____

## JOINT APPENDIX
_____

**JEFFREY A. LOVITKY**

Attorney at Law
1776 K. Street, N.W.,
Ste. 200
Washington, DC 20006
T: (202) 429-3393
F: (202) 318-4013

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUNDERSEN LUTHERAN MEDICAL CENTER, INC. | ) ) ) |
| Plaintiff, | ) ) ) ) ) |
| · vs. | ) Case No. 1:06CV02195 ) ) |
| MICHAEL O. LEAVITT, SECRETARY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) |
| Defendant. | ) ) |

## C E R T I F I C A T I O N

I, Jacqueline R. Vaughn, Attorney Advisor, Centers for Medicare and Medicaid Services, Department of Health and Human Services, under authority delegated by the Secretary, certify that the documents attached constitute a true and accurate transcript of the official file as furnished by the Provider Reimbursement Review Board (PRRB) except for documents designated by the PRRB as containing patient identifier information, which have been excluded. These documents are the record of the PRRB's proceedings and decision and the Administrator's review of that decision concerning monies claimed by Gundersen Lutheran Hospital for cost reporting period ending July 2, 2001, under Title XVIII of the Social Security Act, as amended.

Date: January 15, 2007

Jacqueline R. Vaughn

Gundersen Lutheran Hospital
PRRB Decision No. 2006-D51

## COURT TRANSCRIPTS INDEX

|  | Page No(s) |
|---|---|
| Notice, dated October 31, 2006 of Administrator's Decision | 1 |
| Administrator's Decision, dated October 26, 2006 | 2-7 |
| Provider's Comments. dated October 5, 2006 | 8-11 |
| Comments from Center for Medicare Management. dated September 27, 2006 | 12-14 |
| Notices, dated September 25, 2006, that the Administrator will Review PRRB Decision No. 2006-D51 | 15-16 |
| Notices, dated September 14, 2006 of PRRB Decision | 17-19 |
| PRRB Decision No. 2006-D51, dated  September 14, 2006 | 20-25 |
| Provider's Final Position Paper with Exhibits and Supplements | 26-871 |
| Intermediary's Final Position Paper with Exhibits and Supplements | 872-904 |
| Notices of Hearing with Acknowledgements | 905-913 |
| Correspondence regarding Hearing on Record | 914-915 |
| Correspondence regarding Position Papers | 916-922 |
| PRRB Acknowledgement and Instructions | 923-924 |
| Provider's Request, dated March 18, 2002 for Hearing | 925-931 |

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



CENTERS for MEDICARE & MEDICAID SERVICES

Office of the Attorney Advisor

OCT 3 1 2006

**VIA CERTIFIED MAIL**

Mr. Jack Ahern
Ahern & Associates
841C South Racine Avenue
Chicago, IL 60607

Re: <u>Gundersen Lutheran Hospital</u>, PRRB Decision No. 2006-D51

Dear Mr. Ahern:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board.  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

1

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| Gundersen Lutheran Hospital | Provider Cost Reimbursement Determination of Reasonable Costs for ESRD Window End Date - July 2, 2001 |
| Provider | |
| vs. | |
| Blue Cross Blue Shield Association/ United Government Services, LLC - WI | Review of: |
| Intermediary | PRRB Dec. No. 2006-D51 Dated: September 14, 2006 |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The parties were notified of the Administrator's intention to review the Board's decision. The Provider and CMS' Center for Medicare Management (CMM) submitted comments in this case. Accordingly, this case is now before the Administrator for final administrative review.

## BACKGROUND

End Stage Renal Disease (ESRD) facilities are reimbursed for outpatient dialysis services under the composite payment rate[1] system. In the instant case, the ESRD

---

[1] The term, "composite payment rate," and the term used in the regulations, "prospective payment rate" refer to the same payments. The prospective payment system (PPS) establishes a per-dialysis treatment composite payment rate, which consists of a labor portion and a non-labor portion. There are two base composite rates: one for hospital based ESRD facilities, and the other for independent facilities. Composite rates, including exception payment rates, remain in effect until CMS announces new payment rates. See 42 C.F.R. §413.170(b) and §2702 *et seq* of the Provider Reimbursement Manual (PRM).

window end date was July 2, 2001. The parties agreed to the following facts. The Provider, an outpatient renal dialysis facility, filed a composite rate exception request with its Intermediary, on July 2, 2001. The 60th working day after July 2, 2001 is September 25. 2001.[2] The Intermediary forwarded the Provider's composite rate exception request and its recommendation to CMS. CMS' decision denying the Provider's exception request was dated September 21, 2001 and was sent to the Intermediary on that date.[3] The Intermediary letter transmitting CMS' decision to the Provider was dated October 1, 2001.[4]

## ISSUE AND BOARD DECISION

The issue before the Board was whether the denial of the Provider's request for an exception to the end stage renal disease (ERSD) composite rate was in compliance with 42 C.F.R. §413.180(h).

The Board majority found that pursuant to §1881(b)(7) of the Act [42 U.S.C. §1395rr(b)(7)] and 42 C.F.R. §413.180(h). the exception request was automatically deemed approved as CMS' determination was sent to the Provider after the 60 working day deadline. The Board majority concluded. as noted in prior decisions.[5] that the regulation has been interpreted as allowing CMS to strictly enforce time limits applicable to providers making an exception request.[6] The Board found that it is only reasonable that the same strict enforcement principles found in the same regulations apply to time limits for CMS. The Board majority further found that CMS chose to establish a cumbersome two-tiered notification system despite the 60 working day limit and to describe the action required as "disapproval." Because the regulations are silent as to time limits for other steps in the process, the statutory and regulatory time limit for disapproval should be interpreted as including all essential elements of the entire disapproval process. including transmission of the notice.

In sum. the Board majority found that CMS did not comply with the statute when it rendered its determination within the 60 working day window. but failed to issue actual notice until after the 60 working day limit. Thus, as a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by §1881(b)(7) the Provider's exception request is deemed approved.

---

[2] See Provider and Intermediary Joint Stipulation No. 3 (Provider Exhibit 18).
[3] See Joint Stipulation No. 4
[4] See Intermediary's letter, Provider Exhibit P-2.
[5] See e.g. Mount Clemens General Hospital, PRRB Dec. No. 2002-D26.
[6] Children's Hospital of Buffalo v. Shalala, No. 00-6187, 2001 App. Lexis 979 (Jan. 24, 2001).

Two members of the Board dissented on the grounds that the statute, regulations and program guidance required only that CMS render its determination not later than 60 working days after the exception request is filed. In the instant case, that action did occur. The Dissent argued that CMS made its decision to deny the Provider's exception request within the 60 working day time limit specified in the statute, regulation, and manual. The Dissent acknowledged that in a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), the Provider did not receive notice of the disapproval until 14 months after the end of the 60 day working period, and the Board found that such inordinate delay may seriously prejudiced that provider's rights, including the option to drop out of the program. The Dissent maintained, however, that in the present case the Provider did not submit its exception request until the final day of the opening "window," and prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision. The Dissent argued that since CMS' denial was communicated to the Provider within four working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made. The Dissent argued that CMS' September 21, 2001 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed with the Intermediary, and was therefore timely.

## SUMMARY OF COMMENTS

CMM commented, requesting reversal of the Board's decision. CMM argued that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMM argued that CMS made its decision to deny the Provider's exception request within the 60 working day time limit specified in the statute, regulation and manual. CMM noted that prior decisions of the Administrator have upheld this position.[7] Thus, CMM concluded that CMS' September 21, 2001 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed timely with the Intermediary.

The Provider argued that the Board's decision was consistent with Medicare law and due process notions of agency notice. The Provider asserted that the notice of denial was submitted to the Intermediary after the 60 working day deadline had already expired, as the Provider received notice of CMS' denial 66 days after the request was filed. The Provider asserted that prompt notification of the Intermediary was

---

[7] Tri-State Memorial Hospital, PRRB Dec. No. 2000-D25, rev'd Admr. May 11, 2000, and Charlotte Hungerford Hospital, PRRB Dec. No. 96-D64, rev'd Admr Nov. 8, 1996.

not made in the instant case, so the Provider's exception should be deemed approved.

The Provider disputed the CMS contention that in order to have a sound basis for challenging the tardiness of exception request disapproval, a claim of prejudice of the Provider's rights must reasonably be made. The Provider maintained that the claim of prejudice requirement provides no metric to determine either how late notification can be, or how much damage a provider must incur in order to substantiate a claim. The Provider also contested CMS' assertion that "prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision." The Provider argued that the record is mute with regard to whether an inquiry was made or not, and that the inference that a provider must contact CMS within 60 days effectively shifts the burden of notification to the provider in direct contradiction of applicable regulation and statute.

The Provider also contended that CMS has the burden of notification which is an essential part of the process of exception request adjudication. Without notification, the decision process is incomplete and the decision itself is left unfinished. The Provider argued that nowhere in the applicable statute, regulation, and manual provisions is there a provision that notification can be delayed until serious damage is incurred by the provider.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been included in the record and considered.

In general, Medicare Part A reimburses approved providers of renal dialysis services on a prospective payment rate basis pursuant to §1881(b) of the Act, and 42 C.F.R. §413.170 *et seq* However, providers may apply for exceptions to the prospective payment composite rate pursuant to §1881(b) of the Act, and the implementing regulations at §413.170.[8] The criteria for granting an exception is set forth at §413.170(g), which states that an exception request may be granted if the Provider demonstrates with "convincing objective evidence" that its per treatment costs are reasonable and allowable, and directly attributable to any of the listed criteria. The regulations at §413.170(f) establish that the burden falls upon the provider to demonstrate to the satisfaction of CMS that it has met the criteria for receiving an exception to the prospective payment rate.

---

[8] See also §2720 of the PRM.

In this case, however, the parties dispute not the merits of the denial of the Provider's exception request, but rather the interpretation of the pertinent statutory and regulatory language governing the timing of CMS determination on composite rate exception requests. The determinative language is found at §1881(b)(7) of the Act. which states:

> [E]ach application for such exception shall be deemed to be approved <u>unless the Secretary disapproves it</u> not later than 60 working days after the date the application is filed. [Emphasis added.]

The Secretary implemented the statutory provision at 42 C.F.R. §413.180(h) which states that:

> An exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary.

In this case, the Provider argues that. because it did not receive notice of CMS' decision within 60 working days after it filed the exception request. the language at §1881(b)(7) renders its request deemed approved. CMM argues that the statutory language requires that CMS' disapproval must be only rendered within the 60 working days or the exception will be deemed approved.

The Administrator finds that the statute states that an exception request "shall be deemed to be approved unless the Secretary <u>disapproves</u> it not later than 60 working days after the date the application is filed." [Emphasis added] The statute does not state that the actual notice of the disapproval must be issued by. or <u>received</u> by, the provider within 60 working days after the application is filed.[9] The Administrator notes that the key word in §1881(b)(7) is "disapproves," which is defined in ordinary use as, "to refuse to approve; reject."[10] The Administrator finds the plain language of the statute using the word "disapproves" requires that CMS render the disapproval of the ESRD exception request within the 60-working day statutory period. The statute does not require that the Provider receive the disapproval, or have notice of the disapproval, within that statutory time period.  Thus, the Administrator finds the Board erred in holding that the exception request was deemed approved because the Intermediary did not transmit the disapproval within the 60-working day period.[11]

---

[9] See also 42 C.F.R. §413.180 (h)

[10] See American Heritage Dictionary, 4th Ed. (Houghton Mifflin) (2000).

[11] Regarding a previous case involving the counting of the 60 working day period, the Administrator found that the record did not show that CMS' disapproval was "rendered" within the statutory 60 working day time frame.



The Administrator finds that CMS' September 21, 2001 disapproval of the Provider's exception request satisfied the statutory and regulatory requirements in that it was made within 60 working days after the request was filed with the Intermediary. Therefore, the Administrator finds the disapproval of the request was timely.

<u>**DECISION**</u>

The decision of the Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF
THE SECRETARY OF HEALTH AND HUMAN SERVICES.

Date: 10/26/06

Leslie V. Norwalk, Esq.
Acting Administrator
Centers for Medicare & Medicaid Services

7

*Ahern & Associates*

| | |
|---|---|
| 841 C South Racine Ave.<br>Chicago, IL 60607 | Phone: (312) 997-2177<br>Fax:     (312) 942-9578<br>Email: AhernConsulting@aol.com |

Sent Via Fax to:     (410) 786 - 0043

Sent Via FedEx:     Airbill Number 8464 4455 0837

Date:     October 5, 2006

From:     Jack Ahern

             Provider Representative

             Gundersen Lutheran Hospital

Re:     Provider Reimbursement Review Board

| | |
|---|---|
| Decision No. | 2006-D51 |
| Case No. | 02-1212 |
| Decision Date: | September 14, 2006 |
| Provider: | Gundersen Lutheran Hospital |
| Provider Number: | 52-0087 |

To:     Jacqueline R. Vaughn

             Attorney Advisor

Gundersen Lutheran Hospital: Provider Comment       Page 1 of 4

5

The Provider reasserts the arguments previously presented to the Provider Reimbursement Review Board and agrees with the Board's decision to approve the Provider's renal dialysis exception request. As such, the Provider respectfully requests that the Board decision be affirmed in the above referenced case.

In the CMS comment submitted to the Administrator, dated September 27, 2006, requesting the Board's decision be reversed, CMS does not contest that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMS also does not contest that the Provider received notice of CMS' denial 66 days after it was filed.

CMS asserts however, that in order to have a sound basis for challenging the tardiness of exception request disapproval, a claim of prejudice of the Provider's rights must reasonably be made. In essence, CMS contends that if the Provider is not financially or otherwise harmed by late notification, then the time limit for notification exceeds the 60-day limit, and may be extended indefinitely until that point at which the Provider is seriously damaged. Moreover, the claim of prejudice requirement provides no metric to determine either how late notification can be, or how much damage a provider must incur in order to substantiate a claim.

Finally, the CMS comment asserts that "prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision." In fact, the record is mute with regard to whether an inquiry was made or not. As such, CMS has absolutely no factual basis to assert that the Provider did not, in fact, contact the Intermediary, (presumably CMS is not implying that the Provider must bypass its Intermediary and directly contact the Division of Chronic Care in Baltimore). However, when CMS suggests that the Provider should have contacted its Intermediary within the 60 day time limit; CMS acknowledges that notification is an essential part of the decision process. The inference that a provider must contact CMS within 60 days effectively shifts the burden of notification to the provider in direct contradiction of applicable regulation and statute. More importantly, for CMS to



allege that the provider did not contact its Intermediary within 60 days to find out if a decision had been made, and for CMS to use this allegation as demonstrable evidence that no claim of prejudice can be made, contradicts the CMS contention that there is absolutely no time limit for Provider notification. CMS has in effect, conceded that the 60-day limit includes provider notification; however CMS places the burden of notification on the provider, not CMS.

However, as the Board concluded in this PRRB decision, 2006-D51, CMS has the burden of notification which is an essential part of the process of exception request adjudication and without notification, the decision process is incomplete, and the decision itself is left unfinished. Moreover, nowhere in the applicable statute, regulation, and manual provisions is there a provision that notification can be delayed until serious damage is incurred by the Provider.

The Board Majority has clearly laid out a sound rationale for rejecting the CMS theory that notification is not subject to the 60-day time limit. The Board correctly found that: "As a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by 42 U.S.C. § 1395rr(b)(7), the Provider's exception is deemed approved."

In closing, the Provider respectfully requests that considering the intent of the 60-day limit and the facts of this case, the Administrator affirm the Board's decision to approve the Provider's exception request.

Respectfully,

Jack Ahern

Jack Ahern
Provider Representative
841C S. Racine Ave
Chicago, Il 60607

Gundersen Lutheran Hospital: Provider Comment                    Page 3 of 4

## CERTIFICATE OF SERVICE

This is to certify that copies have been sent to the following parties via U.S. Mail:

Janet P. Samen
Director, Division of Chronic Care Management
Chronic Care Policy Group
Center for Medicare Management
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244 - 1850

Bernard M. Talbert Esq.
Blue Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680

Jack Ahern

Provider Representative
841C S. Racine Ave
Chicago, Il 60607

October 5, 2006

Gundersen Lutheran Hospital: Provider Comment          Page 4 of 4

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

7500 Security Boulevard
Baltimore, MD  21244-1850

Date:        September 27, 2006

From:        Director
             Division of Chronic Care Management
             Chronic Care Policy Group
             Center for Medicare Management

*rec'd. 09/07/06 aeg*

Subject:     Gundersen Lutheran Hospital (Provider), Provider Reimbursement
             Review Board (Board) Decision No. 2006-D51, Case No. 02-1212,
             September 14, 2006

To.          Director
             Office of the Attorney Advisor

Even though you have already agreed to review this Board decision, we are requesting
that you consider our comments (below).

CMS respectfully disagrees with the Board's thin majority decision (representing 3 out of
5 Board members-2 Board members gave a dissenting opinion) that the Provider's
exception request must be deemed approved because the Provider was not notified of
CMS' decision disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request
is deemed approved unless it is disapproved within 60 working days after it is filed with
its intermediary " CMS made its decision to deny the Provider's exception request within
the 60 working day time limit specified in the statute, regulation and manual.

The exception request at issue in this case was submitted on July 2, 2001. CMS made its
determination to deny the request and forwarded that decision to the Provider's
intermediary on September 21, 2001. The Provider maintains that to be timely, the 60
working day limit required that it receive notification of CMS' final determination on or
before September 25, 2001, but that the denial was not communicated to the Provider
until October 1, 2001. Therefore, the Provider did not receive notice of CMS' denial of
the exception request until at least six working days after it was filed with the
intermediary (the working days between September 21 and October 1, 2001).

Board member Blodgett acknowledged that in a previous case involving the 60-day limit
issue (Mount Clemens General Hospital. PRRB Dec  No. 2002-D26), he agreed with the
Board majority that the provider's exception request should have been deemed approved.
However, in the Mount Clemens case the provider did not receive notice of the
disapproval until **14 months** after the end of the 60 working day period, and the Board
majority found that such an inordinate delay may have seriously prejudiced that
provider's rights, including its option to drop out of the program .

12

In this case, the Provider did not submit its exception request until the final day of the 180 day "exception window". Moreover, prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision. Since CMS' denial was communicated to the Provider within approximately four working days (the working days between September 25 and October 1, 2001) after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made.

We believe, as did the dissenting opinion of two Board members, that CMS' September 21, 2001 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed timely with the Provider's intermediary. Therefore, we believe that the disapproval of the Provider's request was timely.

Please note, to support CMS's request to reverse the above Board decision, we are citing two previous HCFA Administrator's Decisions that reversed previous unfavorable Board decisions on the exact same "60 work day" issue.

The first Decision was rendered on November 8, 1996, Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.

In this case, PRRB Dec. No. 96-D64, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on February 2, 1990. Although HCFA denied the provider's exception request on April 12, 1990 because it lacked necessary documentation and was therefore incomplete, neither HCFA nor the Intermediary communicated the denial to the provider until May 21, 1990. The period from February 2, 1990 to May 21, 1990 is 75 working days. The Board disagreed with the Intermediary's argument that HCFA disapproved the provider's exception request within 60 working days and that notification to the provider is not relevant. HCFA's denial of the exception request was communicated promptly to the Intermediary, but due to a misunderstanding, the Intermediary did not relay notification of the denial to the provider. The provider learned of HCFA's denial of the exception request on May 21, 1990, when it telephoned the Intermediary, inquiring as to the status of the exception request. Following the telephone call, the Intermediary telefaxed that same day a copy of HCFA's April 12, 1990 denial of the exception request. The Board found that the provider's request should be deemed approved under section 1881(b)(7) because the provider was not notified of HCFA's disapproval of the request until after 60 working days from the date its exception request was filed. The Administrator, however, does not agree with the Board's finding that the provider's request for exception should be deemed approved. The Administrator disagrees with the Board's finding that section 1881(b)(7) provides that an exception request will be deemed approved unless notification of the disapproval is given within 60 working days of the filing of the application. The Administration finds that the plain language of section 1881(b)(7) states that a provider's request for an exception is deemed approved only if the Secretary fails to *disapprove* it

within 60 working days of the filing of the request; there is no requirement that the Secretary notify the provider of its disapproval within 60 working days.

The second Decision was rendered on May 8, 2000, Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association.

In this case, PRRB Decision No. 2000-D25, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on April 11, 1994. The Board found that HCFA's June 6, 1994 denial of the provider's exception was not received by the provider until September 17, 1994. The Board noted that the Intermediary acknowledged it did not receive a copy of HCFA's June 6, 1994 denial letter until it followed up with HCFA for the determination pursuant to the provider's August 17, 1994 letter. With respect to the timeliness, the Administrator finds that the record supports that HCFA's denial was made within 60 working days of the provider's exception request filing. The record includes a file copy of the letter, clearly date stamped June 6, 1994, i.e., within 60 working days of the Intermediary's April 11, 1994 receipt of the provider's request. The statute states only that an exception request "shall be deemed approved unless the Secretary disapproves not later than 60 working days after the date the application is filed". The statute does not require that the disapproval must be received by the provider within 60 working days after the application is filed. Thus, in light of the statutory language and HCFA's unrebutted evidence that the denial letter was on June 6, 1994, the Administrator finds that HCFA met the requirement of disapproving the provider's exception request in a timely manner.

For the reasons cited above, CMS met the requirement of disapproving the Provider's exception request in a timely manner, and we respectfully request that the Board decision be reversed.

Janet P. Samen

This is to certify that copies have been sent to the following parties:

Mr. Jack Ahern
Ahern & Associates
841C South Racine Avenue
Chicago, IL 60607

Bernard M. Talbert, Esq.
Blue Cross & Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680



Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043

CENTERS for MEDICARE & MEDICAID SERVICES

Office of the Attorney Advisor

VIA FACSIMILE

SEP 2 5 2006

Mr. Jack Ahern, Esq.,
Ahern & Associates
841C South Racine Avenue
Chicago, IL 60607

Re: <u>Gundersen Lutheran Hospital</u>, PRRB Dec. No. 2006-D51

Dear Mr. Ahern:

This is to notify you that the Administrator, Center for Medicare and Medicaid Services (CMS) will review of the above captioned PRRB decision concerning whether the Provider's End State Renal Disease exception request was properly denied for exception request window closing July 2, 2001. Accordingly, this case will before the Administrator, CMS, for review within the next few weeks.

Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be review in light of prior decisions of the Administrator and relevant court decisions. The governing regulation published at 42 CFR 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043 so as to expedite review.**

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it has been rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc: Bernard M. Talbert, Esq., Intermediary's Representative
    Center for Medicare Management, CMS



Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043

**CENTERS for MEDICARE & MEDICAID SERVICES**

Office of the Attorney Advisor
_____

VIA FACSIMILE

SEP 2 5 2006

Bernard M. Talbert, Esq..
Blue Cross and Blue Shield Assn.
225 N. Michigan Avenue
Chicago, IL 60601-7680

Re: Gundersen Lutheran Hospital, PRRB Dec. No. 2006-D51

Dear Mr. Talbert:

This is to notify you that the Administrator, Center for Medicare and Medicaid Services (CMS) will review of the above captioned PRRB decision concerning whether the Provider's End State Renal Disease exception request was properly denied for exception request window closing July 2, 2001. Accordingly, this case will before the Administrator, CMS, for review within the next few weeks.

Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be review in light of prior decisions of the Administrator and relevant court decisions. The governing regulation published at 42 CFR 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043 so as to expedite review.**

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it has been rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc: Jack Ahern, Esq.. Provider's Representative
      Center for Medicare Management, CMS

Case 1:06-cv-... DEPARTMENT OF HEALTH AND HUMAN SERVICES ...2007  Page 20 of 98



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## PROVIDER REIMBURSEMENT REVIEW BOARD

2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

SEP 1 4 2006

Case No.:   02-1212
Decision No.:   2006-D51

**CERTIFIED MAIL**

Mr. Jack Ahern
President
Ahern & Associates
841C South Racine Avenue
Chicago, IL  60607

RE:  Gundersen Lutheran Hospital
     Provider No.:  52-0087
     Exception Request Window Closing - 07/02/2001

Dear Mr. Ahern:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.  Please see enclosure
for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,


Paul J. Crofton, Director
Division of Hearings and Decisions


5 Enclosures
   Final Decision Review and Appeal Information
   Decision
   42 USC 1395oo(f)
   42 CFR 405.1875 and 405.1877

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
|        | Shiva Kavec | 9/14 |        |         |      |
|        | PC | 9/13 |        |         |      |
|        |         |      |        |         |      |
|        |         |      |        |         |      |

**File Copy**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671    FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

SEP 1 4 2006

Case No.:  02-1212
Decision No.:  2006-D51

**CERTIFIED MAIL**

Mr. Bernard M. Talbert, Esquire
Associate Counsel
BlueCross BlueShield Association
225 North Michigan Avenue
Chicago, IL  60601-7680

RE:  Gundersen Lutheran Hospital
     Provider No.:  52-0087
     Exception Request Window Closing - 07/02/2001

Dear Mr. Talbert:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is enclosed.  Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,


Paul J. Crofton, Director
Division of Hearings and Decisions

cc:  United Government Services, LLC-WI

5 Enclosures
   Final Decision Review and Appeal Information
   Decision
   42 USC. 1395oo(f)
   42 CFR 405.1875 and 405.1877

File Copy

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
|  | Shimkunec | 9/11 |  |  |  |
|  | PC | 9/13 |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

21

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq. Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

SEP 1 4 2006

Refer to
Case No.:  02-1212
Decision No.:  2006-D51


Dr. Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Mailstop:  C5-16-03
Baltimore, Maryland 21244-1850


RE:  Gundersen Lutheran Hospital
     Provider No.:  52-0087
     Exception Request Window Closing - 07/02/2001


Dear Dr. McClellan:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.

Also, by copy hereof, the decision and the official case file
containing all items listed in the index are forwarded to the
Attorney Advisor to be returned intact upon completion of the
"Own Motion" review.

Additional information will be furnished upon request.

If you have any questions, please call (410) 786-2671.

Sincerely,



Paul J. Crofton, Director
Division of Hearings and Decisions

Enclosure

cc:  Deputy Chief Counsel for Litigation
     Director, Centers for Medicare Management
     Attorney Advisor

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
|        | Shimwa VEC | 9/13 |        |         |      |
|        | VC      | 9/13 |        |         |      |
|        |         |      |        |         |      |
|        |         |      |        |         |      |

**File Copy**

19

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION
## ON THE RECORD
### 2006-D51

**PROVIDER -**
Gundersen Lutheran Hospital
LaCrosse, Wisconsin

**Provider No.:** 52-0087

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
United Government Services, LLC-WI

**DATE OF HEARING -**
December 14, 2005

**Exception Request Window Closing -**
July 2, 2001

**CASE NO.:** 02-1212

## INDEX

| | Page No |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Parties' Contentions | 3 |
| Findings of Fact, Conclusions of Law and Discussion | 4 |
| Decision and Order | 5 |
| Dissenting Opinion of Gary B. Blogett, D.D.S. and Elaine Crews Powell, C.P.A. | 6 |

20

ISSUE:

Whether the denial of the Provider's End Stage Renal Disease (ESRD) exception request
was in compliance with 42 C.F.R. §413.180(h), which states:

> *(h) Approval of an exception request.* An exception request is
> deemed approved unless it is disapproved within 60 working days
> after it is filed with its Intermediary.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare payments due a provider of dialysis
services for ESRD.

The Medicare program was established to provide health insurance to the aged and
disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services
(CMS), formerly the Health Care Financing Administration (HCFA), is the operating
component of the Department of Health and Human Services charged with administering
the Medicare program. CMS' payment and audit functions under the Medicare program
are contracted out to insurance companies known as fiscal intermediaries. Fiscal
intermediaries determine payment amounts due the providers under Medicare law and
under interpretive guidelines published by CMS. See 42 U.S.C. §1395h, 42 C.F.R.
§§413.20(b) and 413.24(b).

ESRD facilities are reimbursed for outpatient dialysis services under the "composite rate"
system.[1] Under this system, a provider of dialysis services receives a prospectively
determined payment for each dialysis treatment that it furnishes. An ESRD facility must
accept the composite prospective payment rate established by CMS as payment in full for
covered outpatient dialysis treatments unless it qualifies for one of the exceptions in
accordance with the procedures established under 42 C.F.R. §413.180, et seq.

Regarding the exception request, 42 U.S.C. §1395rr(b)(7) states, in relevant part, that:

> Each application for such an exception shall be deemed to be
> approved unless the Secretary disapproves it by no later than 60
> working days after the date the application is filed.

Similarly, 42 C.F.R. §413.180(h)(2000)[2] states:

> Approval of an exception request. An exception request is deemed
> approved unless it is disapproved within 60 working days after it is
> filed with the intermediary.

---

[1] 42 U.S.C. §1395rr and the regulations at 42 C.F.R. §413.180 et seq.

[2] 70 Fed. Reg. 70116, 70331 (November 21, 2005), recodified this subsection. in full text, effective
January 1, 2006, to 42 C.F.R. §413.80(g).

This case involves whether the denial was timely under these provisions.

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Gundersen Luthern Hospital (Provider) is an acute care hospital located in LaCrosse, Wisconsin. This case concerns the Centers for Medicare and Medicaid Services' (CMS)[3] denial of the Provider's application for relief from the composite payment rate established for its Medicare-certified renal dialysis facility.

During certain periods of time referred to as "exception windows," an ESRD provider may request an exception to its composite rate in accordance with the procedures established under 42 C.F.R. §413.180. The exception window at issue in the present case was closed by CMS on July 2, 2001. The Provider filed its exception request with United Government Services (Intermediary) on July 2, 2001. The parties have stipulated that this filing was timely. The Medicare regulation at 42 C.F.R. §413.180(h) states that "[A]n exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." The 60th working day after July 2, 2001 is September 25, 2001.[4] CMS' decision denying the Provider's exception request was dated September 21, 2001 and was sent to the Intermediary on that date.[5] CMS' decision was mailed to the Provider by the Intermediary on October 1, 2001.[6] The Parties have stipulated[7] that the sole issue before the Provider Reimbursement Review Board (Board) is the timely notification of CMS' decision by the Intermediary. The actual exception request denial by CMS is not at issue before the Board.

The Provider filed a timely request for a hearing with the Board and has met the jurisdictional requirements of 42 C.F.R. §§405.1835-405.1841. The Provider was represented by Mr. Jack Ahern of Ahern & Associates. The Intermediary was represented by Bernard M. Talbert, Esquire, of Blue Cross Blue Shield Association.

PARTIES' CONTENTIONS:

The Provider contends that the exception request must be deemed approved because CMS failed to timely deny the exception. This contention is based upon the plain language of 42 C.F.R. §413.180(h). The Provider asserts that the processing of an exception request does not end until the provider is notified. It asserts that because the Intermediary and CMS did not notify the Provider of CMS' decision to deny its exception request within 60 working days, it must be deemed approved.

---

[3] Previously called Health Care Financing Administration (HCFA)

[4] See Provider and Intermediary Joint Stipulation--Stipulation No 3 (Provider Exhibit 18)

[5] See Joint Stipulation No 4

[6] See Provider Exhibit P-2.

[7] See Joint Stipulation No 1.

The Intermediary contends that the legal measure for the denial is the date of the determination, not the communication of notice. The Intermediary argues that CMS' determination was timely made within the 60-day limit, although it did not communicate that decision to the Provider within that time frame.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board majority finds that pursuant to 42 U.S.C. §1395rr(b)(7) and 42 C.F.R.§413.180(h), the exception request is automatically deemed approved as CMS' determination was sent to the Provider after the 60 working day deadline.

Congress imposed the deadline in the statute, thereby indicating its concern about CMS delays. Prior Board cases and the legislative history illustrate that Congress' concern was well founded.[8] Congressional intent is frustrated if CMS fails to timely send notice of its decision. The 60-day limit is meaningless without communication. As the Board has noted in prior decisions,[9] the regulation has been interpreted as allowing CMS to strictly enforce time limits applicable to providers making an exception request.[10] The Board majority therefore finds that it is only reasonable that the same strict enforcement principles found in the same regulations apply to time limits for CMS.

If CMS had promulgated a regulation that addressed time limits for the full process, including notice, and that established a regulatory grace period for transmission of the decision within a reasonable time after the decision was made, such regulation would likely pass muster as being consistent with the statute. But CMS chose instead to establish a cumbersome two-tiered notification system despite the 60-day limit and to describe the action required only as "disapproval." Because the regulations are silent as to time limits for other steps in the process, the Board majority believes that the statutory and regulatory time limit for disapproval must therefore be interpreted as including all essential elements of the entire disapproval process, including transmission of the notice. The notice was not sent until after the 60-day limit; therefore, it must be deemed approved.

The Board majority does not dispute that the deeming regulation could be read literally as only requiring the CMS *decision* to be made within the 60-day period. Indeed, a literal reading would not even require that CMS' determination be made in writing within the 60-day time limit. However, that interpretation ignores the reality that notice is essential to the exception process and to fundamental notions of due process. Notice is not a mere formality; it triggers appeal rights and permits a provider to reasonably budget or restructure to avoid future losses.

---

[8] See, e g , Mount Clemens General Hospital v Blue Cross and Blue Shield Association/ United Government Services, PRRB Dec No. 2002-D26, July 9, 2002

[9] Id

[10] Children's Hospital of Buffalo v Shalala, No. 00-6187, 2001 App Lexis 979 (Jan 24. 2001)

DECISION AND ORDER:

As a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by 42 U.S.C. §1395rr(b)(7), the Provider's exception request is deemed approved.

BOARD MEMBER PARTICIPATING:

Suzanne Cochran, Esq.
Gary B. Blodgett, D.D.S. (dissenting)
Elaine Crews Powell, C.P.A. (dissenting)
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

SEP 1 4 2006

Suzanne Cochran
Chairperson

24

Dissenting Opinion of Gary B. Blodgett, D.D.S. and Elaine Crews Powell, C.P.A.

We respectfully disagree with the majority's opinion that the Provider's exception request
must be deemed approved because the Provider was not notified of CMS' decision
disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request
is deemed approved unless it is disapproved within 60 working days after it is filed with
its intermediary." No mention is made regarding timely notifying the provider of the
decision. CMS made its decision to deny Gundersen Lutheran's exception request within
the 60 working day time limit specified in the statute, regulation and manual.

The exception request at issue in this case was submitted on July 2, 2001. CMS made its
determination to deny the request on September 21, 2001. The Provider maintains that to
be timely, the 60 working day limit required that it receive notification of CMS' final
determination on or before September 25, 2001, but that the denial was not
communicated to the Provider until October 1, 2001.

Board member Blodgett acknowledges that in a previous case involving the 60-day limit
issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), he agreed with the
Board majority that the provider's exception request should have been deemed approved.
However, in the Mount Clemens case the provider did not receive notice of the
disapproval until **14 months** after the end of the 60 working day period, and the Board
majority found that such an inordinate delay may have seriously prejudiced that
provider's rights, including its option to drop out of the program.

In the present case the Provider did not submit its exception request until the final day of
the opening "window." Since CMS' denial was communicated to the Provider within
four working days after the end of the 60 working day period, no claim of prejudice of
Provider's rights can reasonably be made.

We find that CMS' September 21, 2001 disapproval of Provider's exception request
satisfied the regulatory requirements in that it was made within 60 working days after the
request was filed with Provider's Intermediary. Therefore, the disapproval of the request
was timely.


Gary B. Blodgett, D.D.S.

Elaine Crews Powell, C.P.A.

25

60 Day Limit for Exceptions

# July 2001

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 1 | 2 Intermediary Recieves Exception 1 | 3 2 | 4 4th of July | 5 3 | 6 4 | 7 |
| 8 | 9 5 | 10 6 | 11 7 | 12 8 | 13 9 | 14 |
| 15 | 16 10 | 17 11 | 18 12 | 19 13 | 20 14 | 21 |
| 22 | 23 15 | 24 16 | 25 17 | 26 18 | 27 19 | 28 |
| 29 | 30 20 | 31 21 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

**Exhibit P-1**(a)

10/25/2002 7.29 AM

Page 1

33    1/4

63

# August 2001

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 29 | 30 | 31 | 1 <br><br> 22 | 2 <br><br> 23 | 3 <br><br> 24 | 4 |
| 5 | 6 <br><br> 25 | 7 <br><br> 26 | 8 <br><br> 27 | 9 <br><br> 28 | 10 <br><br> 29 | 11 |
| 12 | 13 <br><br> 30 | 14 <br><br> 31 | 15 <br><br> 32 | 16 <br><br> 33 | 17 <br><br> 34 | 18 |
| 19 | 20 <br><br> 35 | 21 <br><br> 36 | 22 <br><br> 37 | 23 <br><br> 38 | 24 <br><br> 39 | 25 |
| 26 | 27 <br><br> 40 | 28 <br><br> 41 | 29 <br><br> 42 | 30 <br><br> 43 | 31 <br><br> 44 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |

10/25/2002 7:30 AM

Page 1

34    2

64

# September 2002

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 3 Labor Day | 4 45 | 5 46 | 6 47 | 7 48 | 8 |
| 9 | 10 49 | 11 50 | 12 51 | 13 52 | 14 53 | 15 |
| 16 | 17 54 | 18 55 | 19 56 | 20 57 | 21 58 | 22 |
| 23 | 24 59 | 25 60 working days | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |

10/25/2002 7:30 AM

Page 1

35    3

65

# October 2001

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 30 | 1 *Intermediary's Letter dated 10/1* | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

10/30/02 11 06 AM

36    4/4

HCFA
Health Care Financing Administration

NATIONAL FQHC INTERMEDIARY
REGIONAL HOME HEALTH INTERMEDIARY

MEDICARE
PROVIDER SUPPORT DEPARTMENT: 1-877-309-4290
BENEFICIARY SERVICE DEPARTMENT: 1-800-531-9695

Case 1:05-cv-02195-PLF Document 21 Filed 12/18/2007 Page 33 of 98

$\mathcal{A}cc\tau g$

GUNDERSEN LUTHERAN

October 1, 2001

# Exhibit P-2

Mr. Mike Lefevre, CPA
Gundersen Lutheran Hospital
1910 South Avenue
La Crosse, Wisconsin 534601

RE:   ESRD Composite Rate Exception Request
      Gundersen Lutheran Hospital
      Provider Number: 52-0087
      Fiscal Year 2001

Dear Mr. Lefevre:

The Centers for Medicare and Medicaid Services ("CMS") has responded to the request
of Gundersen Lutheran Hospital ("GLH") concerning the exception request filed under
the prospective (composite rate) payment system. GLH's exception request was received
by United Government Services on July 2, 2001. The provider has submitted a timely
request for an atypical services exception subsequent to the implementation of revised
ESRD composite rates effective January 1, 2001 in accordance with Medicare regulation
42 CFR 413.180(d) and section 2720.1 of HCFA Pub. 15-1. GMH has requested an
exception in the amount of $19.79 for salaries and $7.39 for employee benefits under the
atypical patient mix exception criteria.

CMS has concluded that this exception request be **denied in its entirety** because GLH
has not demonstrated an atypical patient mix based on the evidence presented. CMS's
analysis and response to this request is as follows:

> ### Atypical Patient Mix
>
> CMS reviewed the patient documentation submitted by GLH. GLH's FY 2000
> hemodialysis patient data and documentation indicated that the percentage of
> patients over age 65 and the percentage of of diabetic patients exceeded the
> national ESRD data. GLH's FY 2000 hemodialysis data and documentation
> indicated that the mortality rate, transplant rate and LOS (length of stay) did not
> exceed the national data. Based on this data, it appears that GLH does not have an
> atypical patient mix.
>
> CMS reviewed the FY 2000 patient data shown at GLH's Attachment 1. CMS
> compared the FY 2000 PD listing with the FY 2000 hemodialysis listing. The FY
> 2000 PD listing reflected 59 PD patients; however, one patient was listed twice and
> only 22 patients were shown on the FY 2000 hemodialysis listing. This means that
> 36 (59-1-22=36) PD patients were not taken into account by GLH when
> determining its atypical patient acuity.

## UNITED GOVERNMENT SERVICES, LLC.

401 WEST MICHIGAN STREET ♦ MILWAUKEE, WI 53203-2804
A HCFA CONTRACTED INTERMEDIARY

MEDA/6101c (11/00)

46

Case 1:06-cv-02195-TFH-DAR    Document 21    Filed 12/18/2007    Page 34 of 98
HCFA's Response to GLH's Exception Request
Page 2

In addition to affirming the correctness of the intermediary's recommendation, CMS also points out that GLH failed to include 36 PD patients in its analysis, which is a violation of section 2702 of the PRM, which states that the composite payment rate includes home dialysis patients. GLH's exception request is denied because it has not met the exception criterion.

Budgeted Cost Report

In accordance with section 2721.F of the Provider Reimbursement Manual (PRM), facilities filing exception requests must submit a projected budget estimate and utilization trend through the period for which the exception rate is to apply, showing that its allowable cost per treatment is higher than its composite rate, and that the costs in excess of the composite rate are attributable to factors relating to one of the stated exception criteria. Further, any significant variance between budgeted treatments or costs over actual treatments or costs must be addressed in supporting documentation. The documentation to support the projected budget estimate must be submitted on appropriate completed cost reporting schedules.

Submitted Cost Reports

GLH is a hospital that has a hospital-based unit and 5 satellites. Therefore, GLH must submit a Worksheet I series for each ESRD unit and a combined Worksheet I series for all ESRD units. With this exception request, GLH only submitted the combined Worksheet I series with its fiscal year end (FYE) cost reports for 1998 and 1999. GLH did not submit the individual Worksheet I series for each ESRD unit.

GLH did not submit the FYE 2000 and 2001 financial and statistical data on the appropriate cost report forms, namely the Worksheet I series. Consequently, the statistical data, which is shown on the Worksheet I-1 and I-3, were not submitted. Therefore, the financial and statistical data submitted for FYE 2000 and 2001 is *not* sufficient for use in making historical comparisons.

GLH's Attachment 18 reflects the FY 2000 cost report. This financial data is not broken out by inpatient and outpatient costs and/or modality, such as hemodialysis, training CAPD, training CCPD, home program CAPD and home program CCPD. Further, there is no documentation that reflects total hours, hours by treatment and the number of treatments by modality. When Medicare providers file their Medicare cost reports, the providers must follow the prescribed principles of Medicare cost finding and apportionment, and maintaining renal department statistics, in accordance with cost reporting instructions (See 42 CFR 413.198 and section 2718 of HCFA Pub. 15-1 and section 3652 of HCFA Pub. 15-2). This documentation does not meet the Medicare cost reporting requirements. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's Attachment 17 reflects only one page for the FY 2001 cost report. This documentation does not meet the requirements of section 2721.F of the PRM. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's request is denied because the provider did not submit the FYE 1998, FYE 1999, FYE 2000 and FYE 2001 ESRD costs and statistical data in accordance with Medicare program instructions on the appropriate Worksheet I series.

47



Treatment Time

In reviewing, the statistical data on the FYE 1998 cost report ( See the provider's attachment 15), CMS determined that the average treatment time for outpatient treatments and home program treatment was 4 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 21,327 (15,735 outpatient + 5,592 home program = 21,327 treatments). The home program treatments of 5,592 were computed as follows: 1,303 CAPD weeks + 561 CCPD weeks = 1,864 weeks x 3 = 5,592 HP treatments. The hours shown on the two Worksheet I-3s were 85,212 (47,211 + 31,474 +4,564 +1,963 = 85,212). Thus, the average treatment was 4 hours per treatment (85,212/21,327 = 3.995 or 4).

In reviewing, the statistical data on the FYE 1999 cost report ( See the provider's Attachment 13), CMS determined that the average treatment time for outpatient treatment was 1.55 hours.. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 22,284 (16,422 outpatient + 5,862 home program = 22,284 total treatments). The home program treatments of 5,862 were computed as follows: 1,274 CAPD weeks + 680 CCPD weeks = 1,954 weeks x 3 = 5,862 HP treatments. The hours shown on the two Worksheet I-3s were 34,447 (18,404 + 9,202 + 4,461 + 2,3820 = 34,447). Thus, the average treatment was 1.55 hours per treatment (34,447/22,284 = 1.55).

In comparing the average hours per treatment for FYE 1998 of 4 to the average hours per treatment for FY 1999 of 1.55, CMS is concerned about the accuracy of the statistical data shown on the two cost reports. Further, national audited data for 1988 and 1991, the latest available shows that the average direct patient care hours, excluding social workers and dieticians, were 3.00 hours per treatment. Thus, GLH's nursing hours per treatment reflected in its latest filed cost report was not atypical. Accordingly, GLH has not furnished sufficient historical evidential documentation that it furnished atypical nursing services.

Recommendations

The burden of proof for justifying an exception request rests with the provider not CMS nor its intermediary [See 42 CFR 413.180 (g)].

The provider must submit its actual ESRD costs and the budgeted costs on the appropriate Worksheet I series in accordance with Medicare program instructions.

It is in the provider's best interest to file as soon as possible. When a provider files near the end of the exception window, the provider does not have an opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request. Finally, due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. CMS approves or denies the exception request based on the documentation submitted. No additional information is requested.



HCFA's Response to ████'s Exception Request
Page 4

Conclusion

Based on the above analysis, GLH's exception request is denied. The provider
will continue to be paid its composite rate.


If you wish to appeal CMS's findings, please refer to 42 CFR 413.194 (b) for information
on facility appeals of renal exception requests. Finally, if you have any questions or
comments, please call Joan Meyers at (414) 226-6940.


Sincerely,

John Stoll
Manager – Provider Reimbursement

49



**Gundersen Lutheran (GL)**, Provider Number 52-0087, is a 291 bed, full service hospital located in LaCrosse, Wisconsin. Gundersen Lutheran's hospital based outpatient renal dialysis unit, provides outpatient hemo dialysis to the residents of LaCrosse, Wisconsin and the surrounding area. As a the central hospital in a system of 6 hospital based dialysis units, GL also provides backup support to its 5 satellites located throughout northern Wisconsin and Iowa as illustrated on the following page.

**Regulatory Basis for Exception**

This request for an exception to the outpatient renal dialysis composite rate is based on Medicare regulations as detailed in Chapter 27 of the Provider Reimbursement Manual (PRM).

**Method of Statistical Comparison and Patient Sampling**

Statistical comparisons in this document have been made between data for both FY 1999 and 2000. The national norms used for comparison purposes are based primarily on the 1997 End Stage Renal Disease Patient Profile Tables prepared by the ESRD Information Analysis Branch, Bureau of Data Management and Strategy, of the Health Care Financing Administration.

**Atypical Service Intensity (Patient Mix) Exception Criterion**

The Health Care Financing Administration has developed the Atypical Service Intensity (ASI) criterion in order to protect both the patient and the provider from suffering unduly from the elevated cost of servicing a sicker than average patient population. Several aspects of the Atypical Service Intensity (ASI) criterion as outlined in Chapter 27 of the Provider Reimbursement Manual (PRM), pertain directly to our unit and will be addressed in detail throughout this first section of our request.

# Exhibit P-3

50

Atypical Indicators: Page 1 of 8

82

## Gundersen Memorial Medical Center and Satellites



Tri-County Memorial Hospital,
Whitehall, WI

Tomah, Memorial Hospital
Tomah, WI

Gundersen Lutheran,
LaCrosse, WI

Vernon Memorial Hospital
Viroqua, WI

Palmer Lutheran Hospital,
West Union, IA

Prairie Du Chien Memorial
Prairie Du Chien, WI

© 2001 MapQuest.com, Inc.

51

83

# GENERAL INDICATORS OF AN ATYPICAL PATIENT POPULATION

## Age and Demographics

According to the most recent US Census, 14.9 % of the residents of LaCrosse, Wisconsin are 65 years old or above as compared to only 12.4 % of the nation. Although the ESRD patients at Gundersen Lutheran are clearly a subset of the residents of LaCrosse, Wisconsin, this demographic information is consistent with the higher average age of Gundersen's dialysis patients.

## Age Distribution

The overall age distribution of our patients indicates an <u>atypically high percentage of geriatric patients as compared to the national norms</u>. This is in keeping with our role as a hospital based unit that works with many nursing home patients. It is an accepted medical fact that geriatric patients require more patient care staff time than an average adult patient. We have provided (*see Patient Categories*) a detailed outline of the time and cost associated with managing elderly patients.

| 2000 AGE PROFILE 55 Years Old and Above | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|
| 55 + | 73.3% | 55.8% | 17.5% |

| 1999 AGE PROFILE 55 Years Old and Above | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|
| 55 + | 74.0% | 55.8% | 18.2% |

52



It is obvious from the table below that we have many more elderly patients than the national norm.

**Approximately 14.5% of ESRD patients nationally are above 75 years old, however in the year 2000 28.3% of our patients are over 75!** *In fact, 12.8% of our patients are over 80!*

| 2000 AGE PROFILE | | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|---|
| Age | Total Patients | 187 | | |
| 0 to 14 | | 0.0% | 0.7% | (0.7%) |
| 15 to 24 | | 1.1% | 2.4% | (1.3%) |
| 25 to 34 | | 5.9% | 7.7% | (1.8%) |
| 35 to 44 | | 8.0% | 14.8% | (6.8%) |
| 45 to 54 | | 11.8% | 18.6% | (6.8%) |
| 55 to 64 | | 15.0% | 19.2% | (4.2%) |
| 65 to 74 | | 29.9% | 22.1% | 7.8% |
| 75 + | | **28.3%** | **14.5%** | **13.8%** |
| All Outpatient Hemo | | 100.00% | 100.0% | |

| 1999 AGE PROFILE | | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|---|
| Age | Total Patients | 166 | | |
| 0 to 14 | | 0.0% | 0.7% | (0.7%) |
| 15 to 24 | | 1.2% | 2.4% | (1.2%) |
| 25 to 34 | | 7.2% | 7.7% | (0.5%) |
| 35 to 44 | | 6.0% | 14.8% | (8.8%) |
| 45 to 54 | | 11.4% | 18.6% | (7.2%) |
| 55 to 64 | | 19.9% | 19.2% | 0.7% |
| 65 to 74 | | 27.7% | 22.1% | 5.6% |
| 75 + | | **26.5%** | **14.5%** | **12.0%** |
| All Outpatient Hemo | | 100.0% | 100.0% | |

53

For FY 2000, the Gundersen Lutheran outpatient hemodialysis population shows a measurably higher percent of older patients, especially in the 75 year-old plus area. Gundersen Lutheran also shows fewer of the younger adult and mid age range patients who are usually more compliant and healthier and therefore consume less labor and fewer supplies. It is not uncommon for patients in the 25 to 64 year old range to be working and much more active than older patients. Mid age range patients are not only less costly to treat, they also have less need of easy access to hospital care or the more skilled nursing staff found at hospital based units such as Gundersen Lutheran.

The table below confirms that the highest single age category for volume of treatments rendered is to patients age 75 and above. The two following facts speak loudly to the age and acuity of patients at this unit:

1.    **54.9% of total treatments provided in 2000 are rendered to patients 65 years old and above.**

2.    **30.3% of treatments provided in 2000 are to patients 75 years old and above.**

| 2000 AGE PROFILE Treatment Comparison | | GUNDERSEN LUTHERAN |
|---|---|---|
| Age | Treatments | 8731 |
| 0 to 14 | | 0.0% |
| 15 to 24 | | 1.2% |
| 25 to 34 | | 9.0% |
| 35 to 44 | | 8.8% |
| 45 to 54 | | 16.3% |
| 55 to 64 | | 9.7% |
| 65 to 74 | | 24.6% |
| 75 + | | 30.3% |
| All Outpatient Hemo | | 100.0% |

54



| 1999 AGE PROFILE: Treatment Comparison | | GUNDERSEN LUTHERAN |
| --- | --- | --- |
| Age | Treatments | 7704 |
| 0 to 14 | | 0.0% |
| 15 to 24 | | 0.2% |
| 25 to 34 | | 10.8% |
| 35 to 44 | | 6.9% |
| 45 to 54 | | 14.5% |
| 55 to 64 | | 18.4% |
| 65 to 74 | | 20.4% |
| 75 + | | 28.8% |
| All Outpatient Hemo | | 100.0% |

The age distribution statistics support the contention of an atypical patient population because they show proportionately <u>fewer</u> of the easier to manage patients and proportionately <u>more</u> of the difficult patients.

**Diabetic Profile**

Since diabetic patients require more time and effort than non-diabetic patients, a higher than average proportion of diabetic patients is consistent with an atypical patient population and with higher than average labor costs.

Two facts, as tabulated below speak to the atypically high amount of diabetic patients in our program.

1.    <u>48.7% of the patient population in 2000 was diabetic compared to 33% for the nation.</u>

2.    <u>52.4%, over half of all treatments in 2000, were to diabetic patients.</u>

| 2000 DIABETIC PROFILE: All Patients | GUNDERSEN LUTHERAN | National | Variance |
| --- | --- | --- | --- |
| Percent of Entire Population with Diabetes | 48.7% | 33.0% | 15.7% |

| 2000 DIABETIC PROFILE: Treatments | GUNDERSEN LUTHERAN | National | % Diabetic |
| --- | --- | --- | --- |
| Percent of Treatments to Diabetic Patients | 52.4% | 32.35% | 20.0% |

55



| 1999 DIABETIC PROFILE: All Patients | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|
| Percent of Entire Population with Diabetes | 38.6% | 33.0% | 5.6% |

| 1999 DIABETIC PROFILE: Treatments | GUNDERSEN LUTHERAN | National | % Diabetic |
|---|---|---|---|
| Percent of Treatments to Diabetic Patients | 42.1% | 32.35% | 9.8% |

**Mortality Rate** (Attachment 8)

Attachment 8 contains our mortality information for FY 2000 and 1999. Our mortality rate is 11.2% in the year 2000 which is below the national norm. Granted the older age of our patients, we can only speculate as to why the nation has a higher mortality rate.

| 2000 Mortality Rate | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|
| | 11.2% | 16.0% | (4.8%) |

| 1999 Mortality Rate | GUNDERSEN LUTHERAN | National | Variance |
|---|---|---|---|
| | 12.0% | 16.0% | (4.0%) |

**Inpatient Admissions** (Attachment 11)

Gundersen Lutheran has included a list of inpatient admissions for those members of our entire outpatient ESRD population that were admitted during fiscal year 2000 and also for the fiscal year 1999.

Our average length of stay was 4.81 days per discharge in the year 2000 as opposed to the national average of 8.3 days. It is difficult to compare our data to the national norm because our treatment pattern of discharging patients as soon as possible rather than keeping them hospitalized for long periods of time, may differ from the data used to compile the national norms.

56

**Patients Transplanted (Attachment 7)**

Attachment 7 lists patients transplanted and dates of transplant for our 4 patients transplanted during FY2000 and 2 patients in FY 1999.

**Patients Awaiting Transplants (Attachment 7)**

As requested by HCFA this list of patients is limited to patients who consented and who were on an active transplant list at the end of FY 2000.

**Projected Transplants**

Based on prior and year to date experience, we expect in FY 2001 to have approximately the same number of patients as in previous years.

**Staff Assisted vs. Self-Dialysis Patients**

All of our hemodialysis patients are staff assisted.

**Number of Patient Transfers (Attachment 10)**

We have summarized our patient transfers in Attachment 10 including, date of transfer, point of origin, point of destination. It will be noted that virtually all of our "transfers in" are from tertiary care hospitals such as the Mayo Clinic and that at least virtually all of our "transfers out" are satellite units closer to the patient's home. PRM □ 2725.1 A clearly states that a referral pattern which directs sicker than average patients to a unit is indicative of the sort of atypical patient mix that qualifies for an exception. Our transfer statistics illustrate the fact that we often act as a referral center for more acute patients who come to Gundersen Lutheran to be stabilized, and then, if possible, return to unit located closer to home. "Transfers In / Out" does not include additional patients that were referred to our medical center for treatment related to renal failure but prior to being diagnosed as having End Stage Renal Disease (ESRD). These individuals would be admitted to Gundersen Lutheran first as inpatients, diagnosed as ESRD, and then discharged to our outpatient program. Many have remained with our outpatient program due to higher acuity requiring a

5 7

hospital based dialysis unit. However, it will be noted that we have many more "Transfers Out" than "Transfers In" which is consistent with a referral pattern that captures some patients who, in essence, stabilize and move out. **Attachment 6 (New Patients)** identifies 68 patients who started at our facility in FY2000; this represents 36.4% of our total outpatient population, a very significant number indeed.

$5 8$



# Exhibit P-4

**ATYPICAL NURSING LABOR**

**PRM 2725.1 A**

The Provider Reimbursement Manual, Chapter 27, ⬚ 2725.1 A, states with regard to Atypical Service Intensity / Patient Mix that exceptions may be granted if the facility clearly:

> ***Demonstrates that it expects to incur higher than average per treatment costs which are directly related to a substantial number of treatments to be furnished to patients who, because of their complex medical needs require more intense care, special dialysis procedures, or supplies during an outpatient maintenance dialysis session..... [Emphasis Added]***

Types of facilities that may qualify under these criteria are those providing more intensive dialysis services that are medically necessary for a substantial number of patients such as:

- Patients who are <u>referred from other facilities on a temporary basis for more intense care</u> during a period of medical instability and who return to the original facility after stabilization;

- <u>Pediatric</u> patients who require a <u>significantly higher staff-to-patient ratio than typical adult patients;</u> or

- Patients who <u>are not commonly treated by most dialysis facilities</u> because of complex medical needs which complicate the dialysis procedure and thereby directly increase cost.

GL's patient mix closely parallels all three scenarios presented above.

## Referred from Other Facilities for More Intense Care

PRM ⬚ 2725.1 A clearly states that a referral pattern which directs sicker than average patients to a unit is indicative of the sort of atypical patient mix that qualifies for an exception.

The General Indicators sections also points out how the referral patterns illustrated in **Attachment 10 (Number of Patient Transfers)** is consistent with our role as an outpatient dialysis unit based at a major medical center. The additional time for treating those sicker patients who were referred to us is not separately broken out from the additional time of GL's other sicker than average patients. However, the time consumed by the more intense services

59

Gundersen Lutheran

required by patients referred to us for more intense care is indeed accounted for as part of the atypical clinical time consumed by each patient of our population. Those who were referred, but consumed little or no extra time, will be in few, if any, categories for atypical time and conversely those who had multiple problems, such as being both blind and amputated, will be in several categories.

## Geriatric Patients

In the same sense that the regulations recognize that Pediatric patients often require more intensive dialysis services, many of our geriatric patients, who are in their "second childhood" likewise require more intensive services. The upcoming **Atypical Nursing Time Categories** section of this report arrives at the additional time and effort associated with treating our geriatric patients.

## Not Commonly Treated by Most Dialysis Facilities

As a major regional medical center we have a broad level of experts in all medical fields readily available for consultation. We also have the facilities to quickly provide major medical and surgical procedures. For this reason, we can treat some outpatients that are too unstable or patients who cannot find at other units the specialized level of care we can provide. We have used the patient category descriptions and patient data to illustrate the higher acuity of our patients. One unique category of patients mentioned in our patient categories is our patients who are part of the 30,000 refugees who were relocated to LaCrosse by the U.S. government from areas of Southeast Asia following the Vietnam War. We have several staff member who can translate for these patients who otherwise would have difficulty being understood at other units who have no translators. Many of the photo provided with this exception are of our Asian patients.

## PRM 2725.1 B

Moreover, PRM □2725.1 B states that, "In order for an exception to be granted, any one of the following criteria must be met:

1.   Nursing Service Hours per Treatment.

2.   Number of Employees in Outpatient Renal Area.

3.   Supply Cost per Treatment.

60

4.    Overhead Costs.

5.    Pediatric Facilities.

GL is requesting an exception based on several of the criteria. Each example of ☐2725.1 A and each criterion of PRM ☐ 2725.1 B will be addressed in detail under separate headings in this and following sections.

### Significantly Higher Staff to Patient Ratio

PRM ☐ 2725.1 B lists two criteria which deal with a higher than average staff-to-patient ratio: Number of Employees in Outpatient Renal Area and Nursing Hours per Treatment.

GL has a patient population that requires a "significantly higher staff-to-patient ratio." We will address this issue in the upcoming discussions of "The Number of Employees in Outpatient Renal Area" and "Nursing Service Hours per Treatment as Related to Complex Medical Needs." These discussions show that our higher than average staff-to-patient ratio is a direct result of the higher acuity of our patients.

### NUMBER OF EMPLOYEES IN OUTPATIENT RENAL AREA

With regard to number of employees, PRM ☐2725.1 B.2 states:

> *Data must be submitted that show that higher staff-to-patient ratios represent nursing assessment / intervention hours per treatment based on patient acuity levels. The provider must show that the additional nursing hours per treatment is not the result of an excess number of employees in the outpatient maintenance renal area, compared to facilities treating a similar patient mix.*

### Staff to Patient Ratio

GL has calculated its staff-to-patient ratio from nursing records of clinical staff time and patients treated each day. Our nursing staff has prepared a detailed numerical analysis summary of staff time actually worked and number of patients treated for weeks in one month of each quarter of FY 2000. The number of clinical hours per outpatient averaged approximately 4 worked hours per treatment.

61

**Atypical Labor versus Typical**

There is some debate between providers and HCFA as to where the line should be drawn between typical and atypical hours per treatment. Although we use state of the art equipment and efficient staff allocation methods, the overall age / acuity of our patients as detailed in our patient categories, nonetheless requires additional time on a per treatment basis which drives our labor costs up. HCFA has provided a $ 40 per treatment salary labor median for peer comparison (PRM 2723.3 C). This salary amount does not exclude the direct patient care of renal dieticians and renal social workers. However, if for the sake of argument one conservatively assumes that the following:

1. The only salary cost covered by the $ 40 threshold is for clinical care excluding dieticians and social workers.
2. The market wages at $ 22 / hr for an RN, $ 17/hr for LPN's and $ 12 hr for Technicians.
3. Half of patient care is provided by a mix of 50% LPN's and 50% Tech's.

**Then the average blended patient care wage would be at least in the area of $18 hour which translates to 2.22 hours of nursing staff time.** One could more realistically assume higher hourly salaries, more RN and LPN care and included 15 minutes per treatment of time spent with the patient by Dieticians and Social Workers at average wages of $16/ hour, or $ 4 per treatment. Then the remaining $36 would cover about 1.8 nursing care hours per treatment. The average amount of nursing time per treatment for a typical patient mix has also been calculated as 2.17 worked hours using HCFA's own labor statistics as detailed in **Attachment 5, (Base Time Calculation for an Average Patient).** Clearly we exceed this amount by approximately 1 hour. The industry standard for the number of healthly patients handled by a nurse is 3 patients per 1 nurse; for a 5 hour dialysis run, this 0.33 staff to patient ratio equates to 1.67 hours per treatment.

However, in adjudicating exception requests during the prior window that closed, August 28, 2000, HCFA used a 3.00 hour clinical labor time per treatment threshold excluding Dietician and Social Worker labor time. Provider requests to HCFA for substantiation of this standard were greeted repeatedly with the response that the providers would need to use the Freedom of Information Act (FOIA) to obtain the study referred to by HCFA. Several FOIA requests have been made for this information as early as January 3, 2001. Despite approval for expedited handling, HCFA's FOIA officer was only able to provide other procedural documentation pertaining to specific exception requests until June 27, 2001. Up until that date no substantiation or qualification of this 3.00 standard had been proffered. Key questions that would allow a fair comparison between GL' s unit and this standard had been left unanswered: What portion of the

62

3.00 hour standard represents RN time? Which hospitals or dialysis units made up the sample? Were inpatient treatments in this sample? Why is there a labor dollar threshold of $ 40 in the regulations but no hour threshold? A RN can do more in an hour than a technician or LPN. However, RN's are higher trained, able to provide more services, and therefore are higher paid. HCFA's dollar threshold takes efficiency and hourly wage into account: $40 represents roughly two hours of RN time or three hours of tech time so less time at higher wage can be balanced against more time at a lower wage. Using a 3.00 hour threshold with no qualification ignores the level of care provided, while centering on time used to provide the service, rather than intensity as the regulations require.

The information sent by HCFA to the provider's representative consisted merely of a computer printout **Attachment 9 B (HCFA Study for 3.00 Hours / Treatment)**. The printout is apparently a summary of information taken from the cost reports of audited independent facilities. There are several problems with this approach:

1.    No rationale is provided for why these facilities were chosen.

2.    No methodology is shown for how the audits were performed.

3.    We have no copies of the base information.

4.    The years audited are now 13 years out of date.

5.    The clinician hour totals numbers were probably paid hours including vacation days which would inflate the hour amount by as much as 13% reducing the median for worked hours per treatment to 2.62.

6.    There were possibly dollar amounts mixed with hours on the statistics portion of the cost reports (presuming cost reports were used).

7.    Finally, Social Worker and Dietician time is indeed included in the 3.07 hour total. Please see **Attachment 9 C** that highlights the use of Social Worker and Dietician time in HCFA's work.

**Prudent use of Clinical Resources**

It should be noted that within the parameters of providing adequate care we have maximized the use of lower cost LPN / Technician labor in an effort to cut our labor costs. **Clearly, GL exceeds any reasonable threshold for average time per treatment rendered to less aged and less acute patients.** The only question remaining is how this time is correlated to the acuity of our patients. The quantification of the causal link between the acuity of our patients and the higher than average staff hours has been obtained by multiplying the atypical clinical staff time per treatment times the number of treatments per category.

63

### 1) Diabetic – Average Additional Time per treatment  10 Minutes

In 1999 and 2000 44% of dialysis patients at Gundersen Lutheran had diabetes
mellitus. When caring for patients with diabetics greater time must be taken in the
assessment of their health status which includes not only their immediate needs
related to ESRD but also ongoing assessment of their peripheral vascular
circulation in all extremities, blood sugars, nutritional intake as well their ability
to care for themselves.  Frequently accuchecks are needed to assess their current
blood sugars.

Photo
Removed

This is especially true in our patients who are non compliant in the care of their
diabetic condition.   Approximately 10 diabetic patients at Gundersen Lutheran
require an accucheck a minimum 1-3 times per week.  The cost Gundersen
Lutheran incurs is $20.00 per accucheck or $1040.00 - $3120.00 per year.

### 2) Older Patients – Average Additional Time per treatment  10 Minutes

In 1999, 90 patients and in 2000, 109 patients within the dialysis practice at
Gundersen Lutheran are over the age of 65.  This patient population requires more
nursing care related to ambulation toileting and other activities of daily living.  In

# Exhibit P-5

**Page 1 of 9**

P 24

93

many cases they have decreased sensory ability such as hearing loss and loss of memory. They have increased risk for falls. They have increased incident of co morbid conditions. These facts increase the time needed to care for them by 20-25 minutes.

Photo
Removed

Many of our patients reside in area nursing homes. This requires increased nursing time to communicate with the care providers in the nursing homes to allow for not only optimal dialysis care but also optimal all around care. Many of these patients have transportation issues. When this occurs extra time must be spent by our medical social worker to find adequate transportation. Because of the transportation issues we are limited related to the times many of these patients are able to dialyzes. Transportations and scheduling issues take a minimum of 20 –30 minutes to address.

## 3) Anticoagulation- Average Additional Time per Treatment - Time per Draw  15 Minutes

Anticoagulation levels are drawn per Nephrologists order. The average patient needing anticoagulation studies is drawn weekly however anticoagulation studies can be drawn 2 times per week or every 2-3 weeks depending on patient need,

At Gundersen Lutheran the laboratory samples are drawn on all hemodialysis patients who are on Coumadin.  Patients on Coumadin for one of several reasons:

- to maintain renal catheter patency
- to prevent thrombosis of the vein when a hemodialysis catheter is in place
- for cardiac conditions such as atrial fibrillation
- for a history of blood clots

The results of the anticoagulation studies are communicated to the Nephrologist or the Nurse Practitioner to allow for changes in orders based.  When a Coumadin dosage is changed the Care Managers call the patient's pharmacy to order the new dosage.

**4) Mental Status – Average Additional Time per Treatment  15 Minutes**

Within our Hemodialysis practice at Gundersen Lutheran we have a minimum of 6 patients who have been diagnosed with schizophrenia and are hospitalized in a county home for the mentally ill. They require an attendant to be on the unit to address their mental health needs.  We also have 5 patients who cognitively delayed as well as approximately 10 patients who have decreased mentation.  All of these patients are less able to perform any self care tasks and require more time to transfer as well as repeated explanation throughout the treatment of the process of dialysis as well as the procedures.

Photo

Removed



**5) Limited mobility – Average Additional Time per Treatment  20 Minutes**

62 patients in 1999 and 78 patient in 2000 receiving hemodialysis at Gundersen Lutheran were wheelchair bound.   These patients needed the assistance of 1 or more renal staff member to obtain their weight, preparing their dialysis chair and checking of their

temperature which requires a minimum of 20-25 minutes.    14 patients in 1999 and 17 patients in 2000 were amputees.  12 patients in 1999 and 2000 rely on a lift devise for transfer from their wheelchairs to the dialysis chair.

Photo Removed

Hoyer lift transfers at Gundersen Lutheran require the assistance of 2 renal staff members and take an average of 20-25 more than the typical dialysis patient who is able to set himself/herself down in their chair, check their temperature and weight.

### 6) Communication Barriers – Average Additional Time Per Treatment  10 Minutes

11% of dialysis patients at Gundersen Lutheran have a communication barrier related to hearing lose or language barrier.  When patients have hearing lose the time in it take to care for the patient increases to allow for this communication barrier.  We also have many patients who either do not speak English or which English is their second language. Most are from Southeast Asia.

Gundersen Lutheran                                                    Atypical Patients

Photo
Removed

We are very fortunate at Gundersen Lutheran to have on staff 2 Hmong interrupters
however in most cases we must wait for their services and as in any effort to translate
from one language to another more time is required from the dialysis staff members.
There are patients who because of decreased cognitive ability are unable to
communication if an effective and concise manner.  We also have patient who have had
CVA's and there ability to communication verbally and in writing is greatly diminished.


## 7) Non Compliance – Average Additional Time Per Treatment  20 Minutes

Many patients returned for difiltration.  The majority of these are non compliant. More
staff is required to meet the needs of the patients for difiltration treatments as well as to
counsel them on ways to better care for themselves.  We feel it is imperative to meet not
only the difiltration needs of the patients but it is morally and ethically imperative to
counsel them on the needs for adequate self care.  If patients are not difiltated in a timely
manner they will likely be admitted in acute care in fluid overload.


## 8) CVC – Average Additional Time Per Treatment  15 Minutes

Gundersen Lutheran                                    Atypical Patients

It take a minimum of 15 minutes longer to put a patient with a central venous catheter on dialysis than a patient with a fistula or graft due to the DOQI Guideline protocol. The central venous catheter dressing changes are done one time per week or as needed to keep the exit site of the catheter dry and occlusive.

## 9) O2 – Average Additional Time Per Treatment  5 Minutes

61 patients require 2-3 liters of oxygen during their dialysis treatment to maintain optimum oxygen saturation level as well as their comfort level. The cost of O2 per treatment is $3.96 based on the average run time at Gundersen Lutheran of 3.6 hours. This cost includes tubing.

Photo Removed

## 10) Medications – 1 medication requires 3 Minutes
##                  2 medications require  6 Minutes
##                  3 medications require 10 minutes
##                  4 medications require 15 Minutes

Administering Medications also requires additional time. The more medications given, the more time is required. Columns are shown on the Atypical Categories and atypical Minutes spreadsheets in Attachment 2 which list time for giving 1,2,3, and 4 drugs respectively during the dialysis treatment.

- EPO
- Iron
- Calcijex
- Heparin Protocol

**11) Satellite Patients – Average Additional Time per Treatment  30 Minutes**

Gundersen Lutheran operates five satellite dialysis units to meet the needs of ESRD
patients in the Tri-Sate area. The patient transferred to the satellite units must meet the
criteria for not only transfer but also to continue dialysis treatment in a satellite facility
Patients are transferred/referred back to the main campus when:
>    They no longer meet the criteria for dialysis in a satellite
>    There are access problems which include inadequate flows in a fistula, graft or
>    catheter
>    When a fistula, graft or catheter needs to be replaced or revised.

When transfer/referral of satellite patients occurs extra staff is needed to meet the needs
of these patients. Many times this moves staff in over times. Many of our patients, when
the need for transfer/referral occurs, require the assistance the Medical Social Worker to
address transportation issues. This assistance takes an average of one hour per incident.

**12) Blood Administration – Average Additional Time per Treatment  15 Minutes**

In 1999, 75 units of blood products were administered during hemodialysis
In 2000, 67 units of blood products were administered during hemodialysis
When blood and blood products are administered extra monitoring and assessment of the
patient is required to insure the safety of the patient during administration. The
monitoring and assessment increases staff demands by 25-30 minutes per incident.

**13) Access  Flow Rates – Average Additional Time per Treatment  15 Minutes**

All patients with new fistulas or grafts are evaluated initially to obtain a baseline flow
rate of their access. The procedure is done by a registered nurse. Ongoing access
monitoring to assess flow rates are done a minimum of every 6 months and more often as
indicated on all patients within the Gundersen Lutheran Hemodialysis Practice.

Photo
Removed

This helps to identify flow rate problems in a timely manner allowing the patients the best possible dialysis/ outcomes. Access monitoring requires approximately 30 minutes per patient. This includes patient education related to the procedure and documentation time but does not include travel time to the satellites.

## 14) Isolation – Average Additional Time per Treatment  15 Minutes

In 1999, 3 patients and 2000, 11 patients required isolation for various reasons including:

- MRSA
- VRE
- Hepatitis B
- Hepatitis C

Isolation of patients require an increase of 15 minutes nursing time over the usual patient care time due to the use of personal protective equipment. The use of this equipment not only protects the staff from transfer of these bacteria/viruses to themselves but also to other patients.

## 15) CVC Infections – Average Additional Time per Treatment 10 Minutes



**ALLOCATION OF COSTS ON MEDICARE COST REPORT (Attachments 13 and 14)**

The Medicare renal dialysis composite rate is a fixed, per treatment, rate that the hospital is paid by Medicare for each outpatient dialysis treatment rendered to a Medicare patient. The worksheet schedules I-1, I-2, I-3, and I-4 of the Medicare Cost report allocate direct and indirect cost to the various modes of dialysis and compute a cost per treatment for services covered under the Composite Rate. The Composite Rate payment, however, is a global payment for prescribed dialysis services and is neither increased nor decreased to reflect costs of rendering services as calculated in the Medicare cost report. Nonetheless, when a provider applies for an increase or exception to the Composite Rate, the exception request process uses the worksheet I schedule cost allocation as the primary basis for determining whether an exception should be granted, and, if so, how much the increase in payment should be.

In accordance with PRM, section 2721 G, GL is submitting a copy of its most recently filed cost report, **Attachment 13 (FY1999 Cost Report Information).** Support information and renal work papers for the last filed cost reports including patient cost and statistical information used to allocate cost on the cost report are in **Attachment 14 (Renal Schedule Detail).** It will be noted that we have re-filed our entire cost report, not just the worksheet I schedules, prior to submitting this exception request. Section 2721 G of the Provider Reimbursement Manual clearly states, "No intermediary approval is needed [to revise a cost worksheet I schedule] if the facility is changing to the recommended statistics in accordance with cost reporting instructions contained in HCFA Pub. 15 – II."

**Inpatient Costs**

The method of allocation of staff cost is detailed in the work papers. We refer the reader to **Attachment 14 (Renal Schedule Detail).**

# Exhibit P-6

GUNDERSEN LUTHERAN

## CRITERIA FOR PAYMENT RELIEF: ATYPICAL SERVICE INTENSITY

### Calculation of Additional Atypical Labor Costs

The Provider Reimbursement Manual, Chapter 27, □ 2725.1 A, states with regard to Atypical Service Intensity /

Patient Mix that exceptions may be granted if the facility clearly:

> *Demonstrates that it expects to incur higher than average per treatment costs which are directly related to a*
> *substantial number of treatments to be furnished to patients who, because of their complex medical needs*
> *require more intense care, special dialysis procedures, or supplies during an outpatient maintenance dialysis*
> *session...*

GL has computed the additional labor cost of treating more acute patients through time determinations, grouped by

atypical patient category, and the time cost of nursing labor.


### Patient Category Calculation

Additional labor is calculated by multiplying the time above and beyond the norm associated with treatments in each

category times the total number of treatments for our FY 2000 hemodialysis patients in each category, see **Attachment**

**2 (Total Minutes per Patient)**. This gives us the total additional time due to the atypical nature of our patients.

Some of the complex medical needs of our patients usually require only RN time; other elements, such as ambulation

assistance, can be performed by LPN's or technicians. We therefore multiplied the additional time by the blended (total

salary / total hours) average RN and non – RN hourly cost. This figure was determined by using our payroll

information. Using this method, the total cost of additional nursing time is estimated at $ 167,757 per year or $ 19.21

per treatment for FY 2000.


The base total labor cost for typical patient mix is HCFA's national standard labor cost limit of $ 40 per treatment. In

addition to the base cost of $ 40 (inflated for increases in labor cost since this standard was issued by HCFA over 10

years ago) we have incrementally justified additional nursing labor cost of $ 19.21 which projects to 2001 (at a 3%

annual increase in labor costs) to $19.79. This justification totals to $ 69.79 which, when the $40 standard is inflated to

present day value, is close to our entire projected labor cost of $ 76.03 per treatment.  This labor cost is our FY 2000

patient care cost of   $ 73.82 likewise adjusted for a 3% annual increase in labor costs.

**Atypical Employee Benefit Cost**

PRM 2723.3.D, Reasonableness of Cost and Comparison to Peer Group, gives HCFA's median cost per treatment for employee benefits as $ 7 per treatment.   We exceeded this amount by $ 20.58.   Since our employee benefit costs are directly proportional (37%) to direct labor costs, we also attribute our higher indirect costs to our more acute patients. We are asking for relief in this area of 37% of our atypical labor cost of $ 19.49 which comes to $ 7.39 per treatment.

**Prudent Purchasing**

GL is a member of the two bulk purchasing groups and follows strict internal protocols to obtain the lowest possible supply prices for dialysis supplies including: utilizes bulk purchasing, comparative costing as well as a uniform bidding procedure in order to ensure that the lowest possible costs are incurred for supplies. The prices we pay are at, or below, the prices paid by other facilities.   We have provided copies of supply contracts in **Attachment 21 (Evidence of Prudent Purchasing).**

**No Wastage**

Our staff has been instructed in the correct and efficient use of dialysis supplies and very little, if any, supply wastage occurs unless it pertains to the atypical needs of our patients in which case the "wastage" is unavoidable, e.g., a patient pulls out his blood lines and so a second set is required.

**PROJECTED COST AND TREATMENTS**

The cost and treatments used to project our 2001 costs are summarized below accompanied by the rationale for each increase.   A summary of projections is also included in **Attachment 18 (Budget Costs).**

**Treatments**

We do not suspect any significant change in our volume and as such have projected the same number of treatments in FY 2001 as seen for FY 2000.

GUNDERSEN LUTHERAN

**Labor**

The yearly increase in labor costs were based on a 3 % increase in labor costs during fiscal years 2001 and 2002. These cost increases reflect pay increases for our present staff with no significant changes in FTE's working in our unit.

**Supplies**

We projected no significant increase in supply cost in FY 2001. This reflects an assumption that approximately the same quantity of supplies will be used and that we will not experience an increase in cost per item since the majority of our supply contracts will not expire during these years.

**Capital**

Our capital costs are likewise not projected to significantly increase in the next two years.

**E. P. O.**

We have included a projected cost for Epogen on our cost report schedules. As per HCFA instructions this cost has not been included in our final costs.

**Amount of Exception**

Up to this stage in the narrative we have documented that we have an atypically more acute patient population as compared to the nation. We have shown that subsequently our costs are above the national norms with regards to labor and employee benefits costs. These costs have been addressed in depth and will now be summarized in order to arrive at the requested treatment payment. The incremental costs associated with the Atypical Service Intensity criterion have been summarized below on a per treatment basis. Our total requested payment relief for hemodialysis is $ 27.18 as presented below:

### CALCULATION OF REQUESTED PAYMENT RATE

| | | |
|---|---|---|
| Incremental Atypical Labor Costs | $ | 19.79 |
| Benefits | $ | 7.39 |
| Requested Increase in Composite Rate | $ | 27.18 |

# PHOTOS SHOWING

# EXAMPLES OF PATIENTS

# WHO REQUIRE

# ADDITIONAL STAFF

# ASSISTANCE

**NOT INCLUDED FOR REASONS OF
REDACTION**

7 8

113

Gundersen Lutheran Hospital 

# LIST OF ATTACHMENTS

1. PATIENT DATA: 1999 & 2000

   A.   PATIENT LIST INCLUDING PRIMARY DIAGNOSIS AND AGE
   B.   DIABETIC PATIENTS
   C.   PD PATIENTS
   D.   ISOLATION PATIENTS

2. MORE COMPLEX MEDICAL NEEDS: 1999 & 2000

   A.   HOW CATEGORIES WERE DEVELOPED, PRACTICE GUIDELINES
   B    PATIENT CATEGORIZATION
   C.   TOTAL MINUTES PER PATIENT
   D.   COST CALCULATION

3. STAFF AND PATIENTS PER SHIFT PER PATIENT SCHEDULES  (Separately Bound)

4. PROVIDER REIMBURSEMENT MANUAL REGULATIONS

5  BASE TIME CALCULATION FOR AN AVERAGE PATIENT

6. NEW PATIENTS

7. TRANSPLANTATIONS: FY 2000 TRANSPLANTS AND WAITING LIST

8. MORTALITY INFORMATION

9. A.   NATIONAL RENAL STATISTICS
   B.   HCFA STUDY FOR 3.00 HOURS / TREATMENT

10. NUMBER OF TRANSFERS

11. HOSPITAL ADMISSIONS AND AVERAGE LENGTH OF STAY

12. DRUGS / MEDICATIONS / LABORATORY

    A.   List of Drugs / Medications Covered Under Composite Rate

    B.   List of Routine Lab Tests

13. MOST RECENT FILED COST REPORT:  FISCAL YEAR ENDING 12 / 31/ 1999

14. FY 99 Renal Schedule Detail and Work Papers, Cost per Treatment Analysis

15. FY 98 Renal Schedules, Cost per Treatment Analysis, Variance Analysis

# Exhibit P-7

Gundersen Lutheran Hospital

16. Breakout of Costs by Satellite

    A.    Contract Summary
    B.    Cost Comparison· With and Without Satellite Costs
    C.    Cost Analysis by Satellite

17. DIRECT AND INDIRECT COSTS - YEAR TO DATE

18. BUDGETED COSTS: FY 2001 Projected Cost

19. DIALYSIS EQUIPMENT AND DEPRECIATION SCHEDULE

20. SUPPLY LIST FOR HEMODIALYSIS AND DIALYZER COMPONENT COST
    CAPD SUPPLIES
    EPOGEN COSTS

21. EVIDENCE OF PRUDENT PURCHASING

22. PERSONNEL

    1.    Salaries of Each Employee
    2.    Number of Personnel
    3.    Time Spent in Dialysis Unit
    4.    Analysis of Productive - vs - Non-Productive Time
    5.    Medical Director's Fee

23. DUTIES PERFORMED IN DIALYSIS UNIT (JOB DESCRIPTIONS)

24. AUDITED FINANCIAL STATEMENTS

25. INPATIENT / OUTPATIENT CHARGES

26. COMPLETE CONTRACTS WITH SATELLITE FACILITIES



## *Ahern & Associates*

841 C South Racine Ave.   Phone: (312) 997-2177
Chicago, IL 60607    Fax:   (312) 997-2177
                            Email:  JAhernAssociates@aol.com

**Date:**           June 5, 2002

**TO:**           Linda J. Swiderski
                      Senior Auditor
                      401 West Michigan Street
                      Milwaukee, WI  53203

**CC:**           BC & BS Association
                      Wilson C. Leong
                      225 North Michigan Avenue
                      Chicago, Illinois  60601

**RE:**           <u>**PRELIMINARY POSITION PAPER**</u>
                      **Renal Dialysis Exception Request Denial**

                      Provider:          Gundersen Lutheran Hospital
                      Provider Number:    52-0087
                      PRRB Case Number:  02-1212

# Exhibit P-8

### Fiscal Years in Question

The Exception Request is for the time period beginning, July 2, 2001 and continuing until such time as the submission of a new complete renal dialysis Exception Request would be required by the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), in order to maintain any increase granted.

### Amount in Controversy

The amount in controversy will vary directly with the duration of the exception which depends on when CMS ultimately cancels those exceptions to the composite rate payment granted in the exception request window closing July 2, 2001.

The total amount in controversy is the difference between the requested per treatment payment rate and the base composite payment rate for each treatment affected by the exception. Since CMS periodically adjusts the actual payment rate and the duration of the exception is subject to change, the amount in controversy can be only be approximated. The following approximation assumes no change in the base rate, a ten year duration for the exception rate, and no change in treatment volume.

| | | |
|---|---|---|
| Requested Increase in Payment: | $ | 27.18 |
| Annual Medicare Treatments: | $ | 15,863 |
| Annual Differential: | $ | 431,156 |
| Estimated duration: | | 10 years |
| Total Amount in Controversy: | $ | 4,311,563 |

### Issue

Whether or not the Health Care Financing Administration properly denied the above reference Renal Dialysis Exception Request timely filed in July 2001 by **Gundersen Lutheran Hospital, Provider Number 52-0087**. This Exception Request was based on the Atypical Service Intensity (ASI) criteria.

Confidential

E2

### Position of Provider

The Provider holds that the exception request submitted sufficiently demonstrated, in accordance with the regulations as stated in Chapter 27 of the Provider Reimbursement Manual, that Provider's patient population required more intensive dialysis services that are medically necessary for a substantial number of patients. Moreover, the Provider holds that adequate documentation was submitted to clearly demonstrate that due to the sicker nature of the patient population, it incurs higher costs sufficient to justify an exception.

Respectfully submitted,

Jack Ahern
Provider Representative

P - 9

| HCFA | Beneficiaries | Plans & Providers | States | Researchers | Students |
|---|---|---|---|---|---|
| Medicare | Medicaid | CHIP | Customer Service | FAQs | Search |

# End Stage Renal Disease (ESRD) Program

The following patient profile tables provides national data on ESRD patients who are enrolled in the Medicare program as of December 31, 1997. Patient data on deaths and transplants are for those patients included as of December 31, 1997, but who died or were transplanted in calendar year 1998.

The data from these profile tables will be used by HCFA to evaluate patient data of individual ESRD facilities that file ESRD exception requests. Providers may use this patient data to compare national data with their patient data. This data will assist providers to determine if the characteristics of their patient mix is different than national data.

We will also use the following inpatient data for dialysis patients that was obtained from Table 46 of the Health Care Financing - Research Report - End Stage Renal Disease, 1993 - 95 - HCFA Pub. No# 03393. This shows that the following 1994 data

### Dialysis

| | |
|---|---|
| Average Discharges per patient | 1.6 |
| Average Length of stay | 8.3 |

These are the latest data available. We hope to update this data in the near future.

---

## PATIENT PROFILE TABLES

### CONTENTS

Table 1 - Medicare ESRD Dialysis Patients

Table 2 - Medicare ESRD Dialysis Patients by Primary Diagnosis

Table 3 - Medicare ESRD Dialysis Patients by Primary Diagnosis (Deceased)

Table 4 - Medicare ESRD Transplant Patients by Primary Diagnosis

Appendix - List of Primary Causes of End Stage Renal Disease - HCFA-2728

2

---

Exhibit P-9

6/14/01

P. 84
132

## Before the Provider Reimbursement Review Board

| | |
|---|---|
| **Gunderson Lutheran Hospital** ) | |
| ) | **PRRB Case No. 02-1212** |
|     **(Provider)** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **Blue Cross Blue Shield Association/** ) | |
| **United Government Services** ) | |
| ) | |
|     **(Intermediary)** ) | |
| ) | |

### Stipulation of Provider and Intermediary

1.    At issue is whether the denial of the Provider's ESRD exception request was is compliance with §413.180(h), which states:

> (h) *Approval of an exception request.* An exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary.

2.    The Provider's exception request was filed with its intermediary on July 2, 2001. The Centers for Medicare and Medicaid Services (CMS) acknowledged this filing date in Stipulation Exhibit 1 as being timely.

3.    The 60th working date after July 2, 2001 is September 25, 2001.

4.    CMS's decision denying the exception request was dated September 21, 2001 and sent to United Government Services, the Intermediary, on that date (Stipulation Exhibit 1).

$1/3$

5.    The text of CMS's decision was paraphrased and mailed to the Provider on
October 1, 2001, by United Government Services (Stipulation Exhibit 2). This
letter was the first communication of any type to the Provider concerning the
denial of it's exception request.

**For the Provider**

Jack Ahern
Ahern & Associates

**For the Intermediary**

Bernard M. Talbert
Associate General Counsel
Blue Cross Blue Shield Association

Date: September 28, 2004

Date: October 5, 2004

2

# FACSIMILE

Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601
An Association of Independent
Blue Cross and Blue Shield Plans

Date _____ 5 October, 2004 _____

Number of pages including cover sheet _____

To:

Jack Ahern

From:

Bernard M. Talbert

Phone _____

Fax _____

Phone    312.297.6023

Fax    312.297.5956

**REMARKS:**

☐ Urgent    ☐ For your review    ☐ Reply ASAP    ☐ Please comment

The information contained in this facsimile message is attorney/client privilege or confidential information intended only for the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the US Postal Service. Thank You.

If you are having a problem receiving this fax, please call Orysia Drohomyrecka at 312.297.6027.

3/3

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

September 21, 2001

John P. Stoll
Manager
Medicare Provider Reimbursement
United Government Services, LLC
401 West Michigan Street
Milwaukee, Wisconsin 53203-2804

Dear Mr. Stoll:

I am responding to your letter dated July 24, 2001, concerning the exception request filed under
the prospective (composite rate) payment system by Gundersen Lutheran Hospital (GLH),
provider number 52-0087. GLH's exception request was received in your office on July 2, 2001.
GLH requested an increase to its composite payment rate of $19.79 for salaries, and $7.39 for
employee benefits under the atypical patient mix exception criteria. Based on your review of the
documentation submitted by GLH, you recommended that the composite rate requested by GLH
be denied because GLH did not furnish ample supporting documentation to show that its has an
atypical patient mix. As a result of our review of the documentation submitted by GLH and your
office, we have the following comments.

Atypical Patient Mix

CMS reviewed of the patient documentation submitted by GLH. GLH's FY 2000 hemodialysis
patient data and documentation indicated that the percentage of patients over age 65 and the
percentage of diabetic patients exceeded the national ESRD data. GLH's FY 2000 hemodialysis
data and documentation indicated that the mortality rate, transplant rate and LOS (length of stay)
did not exceed the national data. Based on this data, it appears that GLH does not have an
atypical patient mix

CMS reviewed of the FY 2000 patient data shown at GLH's Attachment 1. CMS compared the
FY 2000 PD listing with the FY 2000 hemodialysis listing. The FY 2000 PD listing reflected 59
PD patients; however, one patient was listed twice and only 22 patients were shown on the FY
2000 hemodialysis listing. This means that 36 (59-1-22=36) PD patients were not taken into
account by GLH when determining its atypical patient acuity.

EXHIBIT 1

Page - 2

In addition to affirming the correctness of the intermediary's recommendation, CMS also points out that GLH failed to include 36 PD patients in its analysis, which is a violation of §2702 of the PRM, which states that the composite payment rate includes home dialysis patients. GLH's exception request is denied because it has not met the exception criterion.

Budgeted Cost Report

In accordance with section 2721.F of the Provider Reimbursement Manual (PRM), facilities filing exception requests **must submit** a projected budget estimate and utilization trend through the period for which the exception rate is to apply, showing that its allowable cost per treatment is higher than its composite rate, and that the costs in excess of the composite rate are attributable to factors relating to one of the stated exception criteria. Further, any significant variance between budgeted treatments or costs over actual treatments or costs must be addressed in supporting documentation. The documentation to support the projected budget estimate must be submitted on appropriate completed cost reporting schedules.

Submitted Cost Reports

GLH is a hospital that has a hospital-based unit and 5 satellites. Therefore, GLH must submit a Worksheet I series for each ESRD unit and a combined Worksheet I series for all ESRD units. With this exception request, GLH submitted only the combined Worksheet I series with its fiscal year end (FYE) cost reports for 1998 and 1999. GLH did not submit the individual Worksheet I series for each ESRD unit.

GLH did not submit the FYE 2000 and 2001 financial and statistical data on the appropriate cost report forms, namely the Worksheet I series. Consequently, the statistical data, which is shown on the Worksheet I-1 and I-3, were not submitted. Therefore, the financial and statistical data submitted for FYE 00 and 01 is _not_ sufficient for use in making historical comparisons.

GLH's Attachment 18 reflects the FY 2000 cost report. This financial data is not broken out by inpatient and outpatient costs and/or by modality, such as hemodialysis, training CAPD, training CCPD, home program CAPD and home program CCPD. Further, there is no documentation that reflects total hours, hours by treatment and the number of treatments by modality. When Medicare providers file their Medicare cost reports, the providers must follow the prescribed principles of Medicare cost finding and apportionment, and maintaining renal department statistics, in accordance with cost reporting instructions (See 42 CFR 413.198 and §2718 of HCFA Pub. 15-1 and §3652 of HCFA Pub.15-2). This documentation does not meet the Medicare cost reporting requirements. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

Page - 3

GLH's Attachment 17 reflects only one page for the FY 2001 cost report. This documentation does not meet the requirements of §2721.F of the PRM. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's request is denied because the provider did not submit the FYE 1998, FYE1999, FYE 2000 and FYE 2001 ESRD costs and statistical data in accordance with Medicare program instructions on the appropriate Worksheet I series.

<u>Treatment Time</u>

In reviewing, the statistical data on the FYE 1998 cost report (See the provider's Attachment 15), CMS determined that the average treatment time for outpatient treatments and home program treatment was 4 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 21,327 (15,735 outpatient + 5,592 home program = 21,327 total treatments). The home program treatments of 5,592 were computed as follows:1,303 CAPD weeks + 561 CCPD weeks = 1,864 weeks X 3 = 5,592 HP treatments. The hours shown on the two Worksheet I-3s were 85,212 ( 47,211 + 31,474 + 4,564 + 1,963 = 85,212). Thus, the average treatment was 4 hours per treatment (85,212/21,327 = 3.995 or 4).

In reviewing, the statistical data on the FYE 1999 cost report (See the provider's Attachment 13), CMS determined that the average treatment time for outpatient treatments and home program treatment was 1.55 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 22,284 (16,422 outpatient + 5,862 home program = 22,284 total treatments). The home program treatments of 5,862 were computed as follows:1,274 CAPD weeks + 680 CCPD weeks = 1954 weeks X 3 = 5,862 HP treatments. The hours shown on the two Worksheet I-3s were 34,447 (18,404 + 9,202 + 4,461 + 2,380 = 34,447). Thus, the average treatment was 1.55 hours per treatment (34,447/22,284 = 1.55).

In comparing the average hours per treatment for FYE 1998 of 4 to the average hours per treatment for FY 1999 of 1.55, CMS is concerned about the accuracy of the statistical data shown on these two cost reports. Further, national audited data for 1988 and 1991, the latest available, shows that the average direct patient care hours, excluding social workers and dieticians, were 3.00 hours per treatment. Thus, GLH's nursing hours per treatment reflected in its latest filed cost report was not atypical. Accordingly, GLH's has not furnished sufficient historical evidential documentation that it furnished atypical nursing services.

Page - 4

Recommendations

Based on the foregoing, you may consider making the following recommendations to GLH.

The burden of proof for justifying an exception request rests with the provider not CMS nor its intermediary [See 42 CFR 413.180 (g)].

The provider must submit its actual ESRD costs and the budgeted costs on the appropriate Worksheet I series in accordance with Medicare program instructions.

It is in the provider's best interest to file as soon as possible. When a provider files near the end of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request. Finally, the provider should be advised that "due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. CMS approves or denies the exception request based on the documentation submitted. No additional information is requested.

Intermediary Review

Your report, and peer comparison submitted to CMS for final adjudication of this exception request was greatly appreciated.

Payment Rate

Based on the above analysis, GLH's exception request is denied. The provider should continue to be paid its composite rate. If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b)

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

*Joseph Logue*

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management

*GUNDERSEN LUTHERAN*

October 1, 2001

# Exhibit P-2

Mr. Mike Lefevre, CPA
Gundersen Lutheran Hospital
1910 South Avenue
La Crosse, Wisconsin 534601

RE:    ESRD Composite Rate Exception Request
      Gundersen Lutheran Hospital
      Provider Number: 52-0087
      Fiscal Year 2001

Dear Mr. Lefevre:

The Centers for Medicare and Medicaid Services ("CMS") has responded to the request of Gundersen Lutheran Hospital ("GLH") concerning the exception request filed under the prospective (composite rate) payment system. GLH's exception request was received by United Government Services on July 2, 2001. The provider has submitted a timely request for an atypical services exception subsequent to the implementation of revised ESRD composite rates effective January 1, 2001 in accordance with Medicare regulation 42 CFR 413.180(d) and section 2720.1 of HCFA Pub. 15-1. GMH has requested an exception in the amount of $19.79 for salaries and $7.39 for employee benefits under the atypical patient mix exception criteria.

CMS has concluded that this exception request be **denied in its entirety** because GLH has not demonstrated an atypical patient mix based on the evidence presented. CMS's analysis and response to this request is as follows:

### Atypical Patient Mix

CMS reviewed the patient documentation submitted by GLH. GLH's FY 2000 hemodialysis patient data and documentation indicated that the percentage of patients over age 65 and the percentage of of diabetic patients exceeded the national ESRD data. GLH's FY 2000 hemodialysis data and documentation indicated that the mortality rate, transplant rate and LOS (length of stay) did not exceed the national data. Based on this data, it appears that GLH does not have an atypical patient mix.

CMS reviewed the FY 2000 patient data shown at GLH's Attachment 1. CMS compared the FY 2000 PD listing with the FY 2000 hemodialysis listing. The FY 2000 PD listing reflected 59 PD patients; however, one patient was listed twice and only 22 patients were shown on the FY 2000 hemodialysis listing. This means that 36 (59-1-22=36) PD patients were not taken into account by GLH when determining its atypical patient acuity.

## UNITED GOVERNMENT SERVICES, LLC.

401 WEST MICHIGAN STREET ♦ MILWAUKEE, WI 53203-2804
A HCFA CONTRACTED INTERMEDIARY

NEDA46101e (11/00)

*EXHIBIT 2*

In addition to affirming the correctness of the intermediary's recommendation, CMS also points out that GLH failed to include 36 PD patients in its analysis, which is a violation of section 2702 of the PRM, which states that the composite payment rate includes home-dialysis patients. GLH's exception request is denied because it has not met the exception criterion.

## Budgeted Cost Report

In accordance with section 2721.F of the Provider Reimbursement Manual (PRM), facilities filing exception requests must submit a projected budget estimate and utilization trend through the period for which the exception rate is to apply, showing that its allowable cost per treatment is higher than its composite rate, and that the costs in excess of the composite rate are attributable to factors relating to one of the stated exception criteria. Further, any significant variance between budgeted treatments or costs over actual treatments or costs must be addressed in supporting documentation. The documentation to support the projected budget estimate must be submitted on appropriate completed cost reporting schedules.

## Submitted Cost Reports

GLH is a hospital that has a hospital-based unit and 5 satellites. Therefore, GLH must submit a Worksheet I series for each ESRD unit and a combined Worksheet I series for all ESRD units. With this exception request, GLH only submitted the combined Worksheet I series with its fiscal year end (FYE) cost reports for 1998 and 1999. GLH did not submit the individual Worksheet I series for each ESRD unit.

GLH did not submit the FYE 2000 and 2001 financial and statistical data on the appropriate cost report forms, namely the Worksheet I series. Consequently, the statistical data, which is shown on the Worksheet I-1 and I-3, were not submitted. Therefore, the financial and statistical data submitted for FYE 2000 and 2001 is **not** sufficient for use in making historical comparisons.

GLH's Attachment 18 reflects the FY 2000 cost report. This financial data is not broken out by inpatient and outpatient costs and/or modality, such as hemodialysis, training CAPD, training CCPD, home program CAPD and home program CCPD. Further, there is no documentation that reflects total hours, hours by treatment and the number of treatments by modality. When Medicare providers file their Medicare cost reports, the providers must follow the prescribed principles of Medicare cost finding and apportionment, and maintaining renal department statistics, in accordance with cost reporting instructions (See 42 CFR 413.198 and section 2718 of HCFA Pub. 15-1 and section 3652 of HCFA Pub. 15-2). This documentation does not meet the Medicare cost reporting requirements. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's Attachment 17 reflects only one page for the FY 2001 cost report. This documentation does not meet the requirements of section 2721.F of the PRM. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's request is denied because the provider did not submit the FYE 1998, FYE 1999, FYE 2000 and FYE 2001 ESRD costs and statistical data in accordance with Medicare program instructions on the appropriate Worksheet I series.

Case 1:06-cv-02195-TFH-DAR    Document 21    Filed 12/18/2007    Page 87 of 98
HCFA's Response to [ ]'s Exception Request
Page 3

## Treatment Time

In reviewing, the statistical data on the FYE 1998 cost report ( See the provider's attachment 15), CMS determined that the average treatment time for outpatient treatments and home program treatment was 4 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 21,327 (15,735 outpatient + 5,592 home program = 21,327 treatments). The home program treatments of 5,592 were computed as follows; 1,303 CAPD weeks + 561 CCPD weeks = 1,864 weeks x 3 = 5,592 HP treatments. The hours shown on the two Worksheet I-3s were 85,212 (47,211 + 31,474 +4,564 +1,963 = 85,212). Thus, the average treatment was 4 hours per treatment (85,212/21,327 = 3.995 or 4).

In reviewing, the statistical data on the FYE 1999 cost report ( See the provider's Attachment 13). CMS determined that the average treatment time for outpatient treatment was 1.55 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 22,284 (16,422 outpatient + 5,862 home program = 22,284 total treatments). The home program treatments of 5,862 were computed as follows; 1,274 CAPD weeks + 680 CCPD weeks = 1,954 weeks x 3 = 5,862 HP treatments. The hours shown on the two Worksheet I-3s were 34,447 (18,404 + 9,202 + 4,461 + 2,3820 = 34,447). Thus, the average treatment was 1.55 hours per treatment (34,447/22,284 = 1.55).

In comparing the average hours per treatment for FYE 1998 of 4 to the average hours per treatment for FY 1999 of 1.55, CMS is concerned about the accuracy of the statistical data shown on the two cost reports. Further, national audited data for 1988 and 1991, the latest available shows that the average direct patient care hours, excluding social workers and dieticians, were 3.00 hours per treatment. Thus, GLH's nursing hours per treatment reflected in its latest filed cost report was not atypical. Accordingly, GLH has not furnished sufficient historical evidential documentation that it furnished atypical nursing services.

## Recommendations

The burden of proof for justifying an exception request rests with the provider not CMS nor its intermediary [See 42 CFR 413.180 (g)].

The provider must submit its actual ESRD costs and the budgeted costs on the appropriate Worksheet I series in accordance with Medicare program instructions.

It is in the provider's best interest to file as soon as possible. When a provider files near the end of the exception window, the provider does not have an opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request. Finally, due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. CMS approves or denies the exception request based on the documentation submitted. No additional information is requested.

HCFA's Response to GLH's Exception Request
Page 4

Conclusion

Based on the above analysis, GLH's exception request is denied. The provider
will continue to be paid its composite rate.

If you wish to appeal CMS's findings, please refer to 42 CFR 413.194 (b) for information
on facility appeals of renal exception requests. Finally, if you have any questions or
comments, please call Joan Meyers at (414) 226-6940.

Sincerely,

John Stoll
Manager – Provider Reimbursement



**HCFA**
Health Care Financing Administration

PART A... MEDIARY        NATIONAL FQHC INTER...

REGIONAL HOME HEALTH INTERMEDIARY

**MEDICARE**
PROVIDER SUPPORT DEPARTMENT: 1-877-309-4290
BENEFICIARY SERVICE DEPARTMENT: 1-800-531-9695

*Exh. 1*

October 1, 2001


Mr. Mike Lefevre, CPA
Gundersen Lutheran Hospital
1910 South Avenue
La Crosse, Wisconsin 534601

RE:    ESRD Composite Rate Exception Request
       Gundersen Lutheran Hospital
       Provider Number: 52-0087
       Fiscal Year 2001

Dear Mr. Lefevre:

The Centers for Medicare and Medicaid Services ("CMS") has responded to the request
of Gundersen Lutheran Hospital ("GLH") concerning the exception request filed under
the prospective (composite rate) payment system. GLH's exception request was received
by United Government Services on July 2, 2001. The provider has submitted a timely
request for an atypical services exception subsequent to the implementation of revised
ESRD composite rates effective January 1, 2001 in accordance with Medicare regulation
42 CFR 413.180(d) and section 2720.1 of HCFA Pub. 15-1. GMH has requested an
exception in the amount of $19.79 for salaries and $7.39 for employee benefits under the
atypical patient mix exception criteria.

CMS has concluded that this exception request be **denied in its entirety** because GLH
has not demonstrated an atypical patient mix based on the evidence presented. CMS's
analysis and response to this request is as follows:

> <u>Atypical Patient Mix</u>
>
> CMS reviewed the patient documentation submitted by GLH. GLH's FY 2000
> hemodialysis patient data and documentation indicated that the percentage of
> patients over age 65 and the percentage of of diabetic patients exceeded the
> national ESRD data. GLH's FY 2000 hemodialysis data and documentation
> indicated that the mortality rate, transplant rate and LOS (length of stay) did not
> exceed the national data. Based on this data, it appears that GLH does not have an
> atypical patient mix.
>
> CMS reviewed the FY 2000 patient data shown at GLH's Attachment 1. CMS
> compared the FY 2000 PD listing with the FY 2000 hemodialysis listing. The FY
> 2000 PD listing reflected 59 PD patients; however, one patient was listed twice and
> only 22 patients were shown on the FY 2000 hemodialysis listing. This means that
> 36 (59-1-22=36) PD patients were not taken into account by GLH when
> determining its atypical patient acuity.



**UNITED GOVERNMENT SERVICES, LLC.**

401 WEST MICHIGAN STREET ▾ MILWAUKEE, WI 53203-2804
A HCFA CONTRACTED INTERMEDIARY

MPD V63016 (11/00)

HCFA's Response to GLH's Exception Request
Page 2

In addition to affirming the correctness of the intermediary's recommendation, CMS also points out that GLH failed to include 36 PD patients in its analysis, which is a violation of section 2702 of the PRM, which states that the composite payment rate includes home dialysis patients. GLH's exception request is denied because it has not met the exception criterion.

Budgeted Cost Report

In accordance with section 2721.F of the Provider Reimbursement Manual (PRM), facilities filing exception requests **must submit** a projected budget estimate and utilization trend through the period for which the exception rate is to apply, showing that its allowable cost per treatment is higher than its composite rate, and that the costs in excess of the composite rate are attributable to factors relating to one of the stated exception criteria. Further, any significant variance between budgeted treatments or costs over actual treatments or costs must be addressed in supporting documentation. The documentation to support the projected budget estimate must be submitted on appropriate completed cost reporting schedules.

Submitted Cost Reports

GLH is a hospital that has a hospital-based unit and 5 satellites. Therefore, GLH must submit a Worksheet I series for each ESRD unit and a combined Worksheet I series for all ESRD units. With this exception request, GLH only submitted the combined Worksheet I series with its fiscal year end (FYE) cost reports for 1998 and 1999. GLH did not submit the individual Worksheet I series for each ESRD unit.

GLH did not submit the FYE 2000 and 2001 financial and statistical data on the appropriate cost report forms, namely the Worksheet I series. Consequently, the statistical data, which is shown on the Worksheet I-1 and I-3, were not submitted. Therefore, the financial and statistical data submitted for FYE 2000 and 2001 is *not* sufficient for use in making historical comparisons.

GLH's Attachment 18 reflects the FY 2000 cost report. This financial data is not broken out by inpatient and outpatient costs and/or modality, such as hemodialyis, training CAPD, training CCPD, home program CAPD and home program CCPD. Further, there is no documentation that reflects total hours, hours by treatment and the number of treatments by modality. When Medicare providers file their Medicare cost reports, the providers must follow the prescribed principles of Medicare cost finding and apportionment, and maintaining renal department statistics, in accordance with cost reporting instructions (See 42 CFR 413.198 and section 2718 of HCFA Pub. 15-1 and section 3652 of HCFA Pub. 15-2). This documentation does not meet the Medicare cost reporting requirements. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's Attachment 17 reflects only one page for the FY 2001 cost report. This documentation does not meet the requirements of section 2721.F of the PRM. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's request is denied because the provider did not submit the FYE 1998, FYE 1999, FYE 2000 and FYE 2001 ESRD costs and statistical data in accordance with Medicare program instructions on the appropriate Worksheet I series

Case 1:06-cv-02195-TFH-DAR    Document 21    Filed 12/18/2007    Page 91 of 98
HCFA's Response to GLH's Exception Request
Page 3

Treatment Time

In reviewing, the statistical data on the FYE 1998 cost report ( See the provider's attachment 15), CMS determined that the average treatment time for outpatient treatments and home program treatment was 4 hours  This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 21,327 (15,735 outpatient + 5,592 home program = 21,327 treatments). The home program treatments of 5,592 were computed as follows: 1,303 CAPD weeks + 561 CCPD weeks = 1,864 weeks x 3 = 5,592 HP treatments. The hours shown on the two Worksheet I-3s were 85,212 (47,211 + 31,474 +4,564 +1,963 = 85,212). Thus, the average treatment was 4 hours per treatment (85,212/21,327 = 3.995 or 4).

In reviewing, the statistical data on the FYE 1999 cost report ( See the provider's Attachment 13), CMS determined that the average treatment time for outpatient treatment was 1.55 hours.. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 22,284 (16,422 outpatient + 5,862 home program = 22,284 total treatments). The home program treatments of 5,862 were computed as follows: 1,274 CAPD weeks + 680 CCPD weeks = 1,954 weeks x 3 = 5,862 HP treatments. The hours shown on the two Worksheet I-3s were 34,447 (18,404 + 9,202 + 4,461 + 2,3820 = 34,447). Thus, the average treatment was 1.55 hours per treatment (34,447/22,284 = 1.55).

In comparing the average hours per treatment for FYE 1998 of 4 to the average hours per treatment for FY 1999 of 1.55, CMS is concerned about the accuracy of the statistical data shown on the two cost reports. Further, national audited data for 1988 and 1991, the latest available shows that the average direct patient care hours, excluding social workers and dieticians, were 3.00 hours per treatment. Thus, GLH's nursing hours per treatment reflected in its latest filed cost report was not atypical. Accordingly, GLH has not furnished sufficient historical evidential documentation that it furnished atypical nursing services.

Recommendations

The burden of proof for justifying an exception request rests with the provider not CMS nor its intermediary [See 42 CFR 413.180 (g)].

The provider must submit its actual ESRD costs and the budgeted costs on the appropriate Worksheet I series in accordance with Medicare program instructions.

It is in the provider's best interest to file as soon as possible. When a provider files near the end of the exception window, the provider does not have an opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request. Finally, due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. CMS approves or denies the exception request based on the documentation submitted. No additional information is requested.

HCFA's Response to GLH Exception Request
Page 4

Conclusion

Based on the above analysis, GLH's exception request is denied. The provider
will continue to be paid its composite rate.

If you wish to appeal CMS's findings, please refer to 42 CFR 413.194 (b) for information
on facility appeals of renal exception requests. Finally, if you have any questions or
comments, please call Joan Meyers at (414) 226-6940.

Sincerely,

John Stoll
Manager – Provider Reimbursement

DEPARTMENT OF HEALTH & HUMAN SERVICES                         Health Care Financing Administration

_____

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

September 21, 2001

John P. Stoll
Manager
Medicare Provider Reimbursement
United Government Services, LLC
401 West Michigan Street
Milwaukee, Wisconsin 53203-2804

Dear Mr. Stoll:

I am responding to your letter dated July 24, 2001, concerning the exception request filed under the prospective (composite rate) payment system by Gundersen Lutheran Hospital (GLH), provider number 52-0087. GLH's exception request was received in your office on July 2, 2001. GLH requested an increase to its composite payment rate of $19.79 for salaries, and $7.39 for employee benefits under the atypical patient mix exception criteria. Based on your review of the documentation submitted by GLH, you recommended that the composite rate requested by GLH be denied because GLH did not furnish ample supporting documentation to show that its has an atypical patient mix. As a result of our review of the documentation submitted by GLH and your office, we have the following comments.

Atypical Patient Mix

CMS reviewed of the patient documentation submitted by GLH. GLH's FY 2000 hemodialysis patient data and documentation indicated that the percentage of patients over age 65 and the percentage of diabetic patients exceeded the national ESRD data. GLH's FY 2000 hemodialysis data and documentation indicated that the mortality rate, transplant rate and LOS (length of stay) did not exceed the national data. Based on this data, it appears that GLH does not have an atypical patient mix

CMS reviewed of the FY 2000 patient data shown at GLH's Attachment 1. CMS compared the FY 2000 PD listing with the FY 2000 hemodialysis listing. The FY 2000 PD listing reflected 59 PD patients; however, one patient was listed twice and only 22 patients were shown on the FY 2000 hemodialysis listing. This means that 36 (59-1-22=36) PD patients were not taken into account by GLH when determining its atypical patient acuity.

Intermediary Exhibit    1

Page - 2

In addition to affirming the correctness of the intermediary's recommendation, CMS also points out that GLH failed to include 36 PD patients in its analysis, which is a violation of §2702 of the PRM, which states that the composite payment rate includes home dialysis patients. GLH's exception request is denied because it has not met the exception criterion.

Budgeted Cost Report

In accordance with section 2721.F of the Provider Reimbursement Manual (PRM), facilities filing exception requests **must submit** a projected budget estimate and utilization trend through the period for which the exception rate is to apply, showing that its allowable cost per treatment is higher than its composite rate, and that the costs in excess of the composite rate are attributable to factors relating to one of the stated exception criteria. Further, any significant variance between budgeted treatments or costs over actual treatments or costs must be addressed in supporting documentation. The documentation to support the projected budget estimate must be submitted on appropriate completed cost reporting schedules.

Submitted Cost Reports

GLH is a hospital that has a hospital-based unit and 5 satellites. Therefore, GLH must submit a Worksheet I series for each ESRD unit and a combined Worksheet I series for all ESRD units. With this exception request, GLH submitted only the combined Worksheet I series with its fiscal year end (FYE) cost reports for 1998 and 1999. GLH did not submit the individual Worksheet I series for each ESRD unit.

GLH did not submit the FYE 2000 and 2001 financial and statistical data on the appropriate cost report forms, namely the Worksheet I series. Consequently, the statistical data, which is shown on the Worksheet I-1 and I-3, were not submitted. Therefore, the financial and statistical data submitted for FYE 00 and 01 is _not_ sufficient for use in making historical comparisons.

GLH's Attachment 18 reflects the FY 2000 cost report. This financial data is not broken out by inpatient and outpatient costs and/or by modality, such as hemodialysis, training CAPD, training CCPD, home program CAPD and home program CCPD. Further, there is no documentation that reflects total hours, hours by treatment and the number of treatments by modality. When Medicare providers file their Medicare cost reports, the providers must follow the prescribed principles of Medicare cost finding and apportionment, and maintaining renal department statistics, in accordance with cost reporting instructions (See 42 CFR 413.198 and §2718 of HCFA Pub. 15-1 and §3652 of HCFA Pub.15-2). This documentation does not meet the Medicare cost reporting requirements. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

Page - 3

GLH's Attachment 17 reflects only one page for the FY 2001 cost report. This documentation does not meet the requirements of §2721.F of the PRM. Also, this documentation cannot be used for comparison purposes; therefore, the requirements of 42 CFR 413.180 (a) have not been met.

GLH's request is denied because the provider did not submit the FYE 1998, FYE1999, FYE 2000 and FYE 2001 ESRD costs and statistical data in accordance with Medicare program instructions on the appropriate Worksheet I series.

Treatment Time

In reviewing, the statistical data on the FYE 1998 cost report (See the provider's Attachment 15), CMS determined that the average treatment time for outpatient treatments and home program treatment was 4 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 21,327 (15,735 outpatient + 5,592 home program = 21,327 total treatments). The home program treatments of 5,592 were computed as follows:1,303 CAPD weeks + 561 CCPD weeks = 1,864 weeks X 3 = 5,592 HP treatments. The hours shown on the two Worksheet I-3s were 85,212 ( 47,211 + 31,474 + 4,564 + 1,963 = 85,212). Thus, the average treatment was 4 hours per treatment (85,212/21,327 = 3.995 or 4).

In reviewing, the statistical data on the FYE 1999 cost report (See the provider's Attachment 13), CMS determined that the average treatment time for outpatient treatments and home program treatment was 1.55 hours. This was computed by taking the number of outpatient treatments for hemodialysis plus the number of home program treatments and dividing the total number of treatments by the hours shown on the Worksheet I-3. The total treatments were 22,284 (16,422 outpatient + 5,862 home program = 22,284 total treatments). The home program treatments of 5,862 were computed as follows:1,274 CAPD weeks + 680 CCPD weeks = 1954 weeks X 3 = 5,862 HP treatments. The hours shown on the two Worksheet I-3s were 34,447 (18,404 + 9,202 + 4,461 + 2,380 = 34,447). Thus, the average treatment was 1.55 hours per treatment (34,447/22,284 = 1.55).

In comparing the average hours per treatment for FYE 1998 of 4 to the average hours per treatment for FY 1999 of 1.55, CMS is concerned about the accuracy of the statistical data shown on these two cost reports. Further, national audited data for 1988 and 1991, the latest available, shows that the average direct patient care hours, excluding social workers and dieticians, were 3.00 hours per treatment. Thus, GLH's nursing hours per treatment reflected in its latest filed cost report was not atypical. Accordingly, GLH's has not furnished sufficient historical evidential documentation that it furnished atypical nursing services.

Page - 4

Recommendations

Based on the foregoing, you may consider making the following recommendations to GLH.

The burden of proof for justifying an exception request rests with the provider not CMS nor its intermediary [See 42 CFR 413.180 (g)].

The provider must submit its actual ESRD costs and the budgeted costs on the appropriate Worksheet I series in accordance with Medicare program instructions.

It is in the provider's best interest to file as soon as possible. When a provider files near the end of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request. Finally, the provider should be advised that "due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. CMS approves or denies the exception request based on the documentation submitted. No additional information is requested.

Intermediary Review

Your report, and peer comparison submitted to CMS for final adjudication of this exception request was greatly appreciated.

Payment Rate

Based on the above analysis, GLH's exception request is denied. The provider should continue to be paid its composite rate. If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b)

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

Joseph Logue

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management



RECEIVED

MAR 1 9 2002

PROVIDER REIMBURSEMENT
*J. Ahern & Associates*  REVIEW BOARD

C2-1212
SJA
4/5/02

841 C South Racine Ave.        Phone: (312) 997-2177
Chicago, IL 60607              Fax:   (312) 997-2177
                              Email: JAhernAssociates@aol.com

(sent via FedEx, Airbill 832 542 121 215)

March 18, 2002

**To:**         Chairman
              Provider Reimbursement Review Board
              2520 Lord Baltimore Drive, Suite L
              Baltimore, MD 21244-2670

**From:**       Jack Ahern
              841 "C" South Racine Avenue
              Chicago, Illinois 60607

**Re:**         <u>**Renal Dialysis Exception Request Denial**</u>

              Provider:                    **Gundersen Lutheran Hospital**
              Provider Number·             52 - 0087

**Pertinent Dates:**   Exception Request Submission:   July 2, 2001
                      Denial Letter from Intermediary·  October 1, 2001

Dear Mr. Chairman:

In accordance with 42 CFR 405.1835 and 405.1890, provider number **52-0087, Gundersen Lutheran
Hospital (Provider),** requests a Provider Reimbursement Review Board (PRRB) hearing for the recent
denial of a renal dialysis exception request.

<u>**Fiscal Years in Question**</u>

The Exception Request is for the time period beginning **July 2, 2001** and continuing until such time as the
submission of a new complete renal dialysis Exception Request would be required by the Centers for
Medicare and Medicaid Services (CMS· formerly HCFA) in order to maintain any increase granted.

Page 1 of 2

925

**Amount in Controversy**

The amount in controversy will vary directly with the duration of the exception which depends on when CMS ultimately cancels those exceptions to the composite rate payment granted in the exception request window closing July 2, 2001. However, with the Provider's treatment volume, even a single year's increased reimbursement at the requested rate would have resulted in more than $ 10,000 of additional revenue.

**Basis for End Stage Renal Disease Exception Request**

The basis for the Renal Dialysis Exception Request is Atypical Service Intensity.

**Enclosed with this Appeal**

The following documents are enclosed with this appeal

1.      October 1, 2001 Denial Letter from John Stoll, Manager – Provider Reimbursement, of the Medicare Part A Intermediary, United Government Services, LLC.

2.      Letter of Representation.

Please do not hesitate to contact me if you have any questions regarding this appeal.

Sincerely,

Jack Ahern
President

cc:      Barb Johnston, RN Gundersen Lutheran Hospital
         Mike Lefevre, Gundersen Lutheran Hospital
         John Stoll, United Government Services, LLC

JKA/lf

926